**Carlos GRANADOS, Appellant,**

v.

**The STATE of Texas.**

**No. 73,525.**

Court of Criminal Appeals of Texas.

May 8, 2002.

Rehearing Denied Aug. 21, 2002.

David A. Schulman, Austin, for Appellant.

Ken Anderson, DA, Georgetown, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

KELLER, P.J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN joined.

A Williamson County jury convicted appellant of capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Article 37.071, Sections 2(b) and 2(e) of the Code of Criminal Procedure, the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] We will affirm.

### I.

The facts of this crime are particularly relevant to appellant's fifth point of error, which challenges the admission of evidence obtained at the crime scene, and his fourth point of error, which challenges the admissibility of certain statements by a police officer introduced at a hearing on appellant's motion to suppress the crime scene evidence.

### A.

Katherine Jiminez testified at trial and described appellant's actions in detail. She indicated that she first met appellant

---

1. TEX. PENAL CODE § 19.03(a).

2. TEX CRIM. PROC.CODE Art. 37.071, § 2(g).

3. *Id.,* Art. 37.071, § 2(h).

in 1993. The two became friends, spent time together socially, and dated for a short time. They parted ways soon thereafter, but remained in friendly contact. Katherine then married Anthony Jiminez in April of 1994, and on June 13, 1995, she gave birth to a son, Anthony. Katherine and her husband eventually separated, and in late 1997, she re-established a relationship with appellant, who then lived in New York. In January of 1998, Katherine moved into an apartment of her own in Georgetown. In March, appellant visited her from New York. After another visit in July of 1998, appellant decided to return to Texas. Katherine and appellant agreed that they would live together until appellant got on his feet. In late August, he began living with Katherine and three-year-old Anthony in Katherine's apartment.

Less than a month later, on Sunday, September 13, 1998, Katherine, appellant, and Anthony returned to Katherine's apartment after having lunch at appellant's brother's house. Katherine and appellant were both supposed to go to work that evening. Katherine planned to drop Anthony off at her mother's house, where he would remain until Katherine could pick him up the next morning. Appellant wanted Katherine to join him in a nap that afternoon, but she refused, because she still needed to finish chores around the apartment and because she did not want to take a nap while Anthony was awake. Meanwhile, Anthony was in the living room watching television. Appellant, angry that Katherine would not take a nap with him, knocked a plate of food from her hand. The two then retreated to the bedroom where they began arguing. At that point, Katherine told appellant, "I don't even want to talk to you anymore. I don't want to look at you. I don't want you to be around me.... I don't want you here. Just get your things and leave." Appel-

lant said, "You want me to leave?" and Katherine said, "Yeah, I want you to leave."

A brief cooling off period ensued, and the two began talking again. During this time, Katherine's sister Elizabeth called, but appellant said Katherine was busy and hung up the telephone. Katherine told appellant to "get his stuff and leave." Katherine then repeated that she wanted him to leave. Appellant left the room, and when he came back asked again, "You want me to leave?" and she said that she did. Angered, appellant said, "Fuck it. Fuck it," and attacked Katherine with a knife. He stabbed her repeatedly and slashed her throat. Then, apparently, the knife broke. Katherine struggled and attempted to placate appellant by telling him that she loved him. Eventually, appellant began crying, afraid that he would go to jail. Katherine said that she would contrive a false story about her injuries if appellant would simply leave.

Katherine tried unsuccessfully to telephone the police and to escape, but appellant caught her and dragged her to the kitchen. He stabbed her again repeatedly, and she feigned death. Appellant left the kitchen, and Katherine heard Anthony scream, "I don't want to die. Don't kill me. I don't want to die." Stabbed in the chest, Anthony died within moments.

Later, Katherine heard her sister and her nephew outside the apartment. Afraid appellant would finally kill her if she screamed for help, however, she remained silent. Appellant stayed active throughout the night. He came to the kitchen where Katherine lay and showed her that he had slashed his wrists, stating, "Look, I'm going to die with you." Later, he telephoned his father. Several hours later, believing that her death was imminent, Katherine

dragged her body toward her son, wanting to die by his side.

Meanwhile, Katherine's family became worried that they had not heard from her, that she had not arrived for work, and that she had not left Anthony with her mother at the regularly scheduled time. Elizabeth Ojeda, one of Katherine's sisters, testified that, after she called Katherine's apartment, left messages on her answering machine, visited the apartment, and received no response to her knock, Ojeda telephoned the apartment manager and Georgetown Police. Early Monday morning, two officers visited the apartment on a welfare concern call. Corporal Gregory Brunson testified that he noticed both Katherine's and appellant's vehicles in the parking lot of the apartment complex. He also confirmed information about who was paying utilities at Apartment 3206, Katherine's apartment. Corporal Brunson and Officer Vasquez approached the apartment door and knocked, but received no response and heard no noise inside the apartment. Corporal Brunson did not see any lights and could not see inside the apartment windows when looking from the north side of the building. Officer Vasquez telephoned the apartment but received no answer. Upon a request from the officers, the apartment manager arrived with a key but was unable to enter the apartment because of an interior deadbolt. At this point, seeing no other means of opening the door, Corporal Brunson telephoned the fire department for assistance. Three firefighters arrived with what Corporal Brunson described as a doorjamb spreader, which is used to open deadbolted doors. After approximately five minutes, the firefighters opened the apartment door.

Upon entering the apartment, one of the firefighters exclaimed that appellant had a knife. Corporal Brunson drew his revolver, approached the door, and saw appellant, whose right hand was initially hidden. In response to Corporal Brunson's orders, appellant raised his right hand, in which he held a large kitchen knife covered in blood. After ordering appellant out of the apartment, Corporal Brunson repeatedly asked appellant to release the knife. Appellant eventually did so and Corporal Brunson handcuffed him. Inside the apartment, Corporal Brunson saw Anthony's body, Katherine's bloody arms protruding from beyond a chair, and blood stains covering the carpet and walls near the kitchen. Once the officers determined that no one else was in the apartment, they allowed medical personnel to enter and begin treating Katherine, who said to Corporal Brunson, "He killed my baby, and I have been waiting for you to come."

## B.

Appellant's fifth point of error challenges the admissibility of evidence that the officers obtained after the firefighters opened the apartment door. According to appellant, the officers conducted an unreasonable search of the apartment because they had no probable cause to believe that a crime had been committed and their search was not justified under any exception to the warrant requirement of the Fourth Amendment. The State counters by arguing that the emergency doctrine justified the search and that, even if the search itself was unreasonable, Katherine's own testimony provided an independent source for the evidence, apart from the tainted search.

First, we must determine whether appellant has standing to contest the search. An accused has standing to contest a search under the Fourth Amendment only if he had a legitimate expectation of privacy in the place that

government officials or agents invaded.[4] A defendant, who bears the burden of demonstrating a legitimate expectation of privacy, can do so by establishing that he had a subjective expectation of privacy in the place invaded that society is prepared to recognize as reasonable.[5] Several factors are relevant to determining whether a given claim of privacy is objectively reasonable: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy.[6] This list of factors is not exhaustive, however, and none is dispositive of a particular assertion of privacy; rather, we examine the circumstances surrounding the search in their totality.[7]

■ The United States Supreme Court in *Minnesota v. Olson* recognized that an overnight guest has a legitimate expectation of privacy in his host's home.[8] There can be little question that, prior to the events of September 13, 1998, appellant had a reasonable expectation of privacy in the apartment pursuant to *Olson* after he began spending the night. He had kept his belongings there for two or three weeks, he established telephone service in his own name there,[9] and he had freedom to move about the premises. Although appellant makes no claim that he was a legal resident of the apartment (he merely states that he had been "staying there" for a couple of weeks upon his return to Texas from New York), he is perhaps most appropriately characterized as an indefinite overnight guest and thus would have a legitimate expectation of privacy in the absence of his host's demand that he leave and in the absence of other circumstances.[10] The more important question in this case, then, is whether appellant's status changed, for Fourth Amendment purposes, once Katherine asked him to retrieve his belongings and leave the apartment.

Although this situation presents a question of first impression in Texas, several authorities have analyzed the privacy expectations of an overnight occupant of premises that are subjected to a government intrusion, where the occupant's presence on those premises is wrongful or unwelcome.

First, *Olson* itself recognized that its conclusion was premised upon certain observations about social custom, including that, among other things, the houseguest and his possessions "will not be disturbed

4. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

5. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

6. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996).

7. *Id.* at 138–39.

8. 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

9. Katherine's name was also listed on the telephone company record.

10. *Cf. Brown v. State*, 691 N.E.2d 438 (Ind. 1998) (holding that, although defendant did not own the home in which he was staying, he had been living there for two and a half months with his girlfriend and thus had a reasonable expectation of privacy in the premises search (the bedroom)).

by anyone *but his host and those his host allows inside*" and that "[t]he houseguest is there *with the permission of his host.*" [11] The overnight guest doctrine thus assumes that the guest is present with the host's permission when a government intrusion occurs, and that the guest must accept the reality that the host will permit others to intrude.[12] These statements in *Olson* suggest that when, for example, the host chooses to allow others, such as police, inside, or when the houseguest no longer has the permission of his host to be on the premises, the guest's expectation of privacy diminishes.

Second, courts in other jurisdictions have similarly indicated that an overnight guest's expectation of privacy is controlled to a significant degree by the wishes of his host. In several cases, for example, the host has validly consented to the search despite the guest's claim of privacy. In *United States v. Oates*,[13] the United States Court of Appeals for the Eighth Circuit concluded that a defendant did not have a reasonable expectation of privacy in a friend's home, where the defendant had been staying for two weeks and from which he had been selling narcotics. Importantly, according to the court, the defendant had refused to leave the premises after his host requested that he do so, a

fact that militated against his claim of privacy.[14] Similarly, in *United States v. Isom*,[15] the Second Circuit rejected the defendant's Fourth Amendment claim where the defendant, who was an intermittent overnight guest at the home of a woman who had given birth to a child fathered by the defendant's brother, was asked by his host to leave. The court stated that "even if appellant had some right ... as a 'licensee' to countermand [the host's] consent to the search, [the host] had undoubtedly revoked the 'license' by asking appellant to leave her apartment."[16] In *State v. Brown*, the Iowa Court of Appeals concluded that the defendant had a legitimate expectation of privacy as an overnight guest, but that the consent of his host countermanded the privacy interest because the host was the sole tenant on the lease, the host had free access to the entire apartment, and the host had requested that the defendant leave the apartment, which the defendant failed to do.[17] And, most recently, in *Wigley v. State*, the Arkansas Court of Appeals found no Fourth Amendment standing for the defendant, an overnight guest in the home of a parolee who had executed a "consent-in-advance" form as a condition of his parole, because "an overnight guest has no reasonable expectation of privacy

---

**11.** *Olson*, 495 U.S. at 99, 110 S.Ct. 1684 (emphases added).

**12.** *See United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched."). Neither party in the instant case has raised the issue of whether Katherine's failed attempt to contact police *via* the telephone in her bedroom constitutes valid consent to enter and search the apartment.

**13.** 173 F.3d 651, 656 (8th Cir.), *cert. denied*, 528 U.S. 890, 120 S.Ct. 213, 145 L.Ed.2d 179 (1999).

**14.** *Id.* at 656–57.

**15.** 588 F.2d 858, 860 (2nd Cir.1978).

**16.** *Id.* at 861.

**17.** 612 N.W.2d 104, 109 (Iowa Ct.App.2000). *See also State v. Grant*, 614 N.W.2d 848, 853 (Iowa Ct.App.2000) (holding same with regard to girlfriend of appellant in *State v. Brown* ).

when the host consents to the search." [18]

In other cases, the offender's mere presence on the host's premises without the host's permission has defeated any objective claim of privacy. In *United States v. Kitchens*, for example, the Fourth Circuit concluded that the defendant did not have a reasonable expectation of privacy in his motel room once the rental period had expired, absent a pattern or practice on the part of the hosts (the motel management) that permitted guests to stay in their rooms past check-out time.[19] In *State v. McCray*, the Wisconsin Court of Appeals held that a defendant who had stayed overnight in another's home had neither a reasonable expectation of privacy in, nor standing to contest a search of, the premises where the defendant had exceeded his authorized stay in the home.[20] And in *State v. Turnbill*, the Tennessee Court of Criminal Appeals held that a defendant who had been evicted from a room at a rescue mission lacked standing to contest a search of the premises, even though he took normal precautions to maintain his privacy there, such as locking the door to the room.[21] Thus, the general rule that has evolved is that the defendant must establish that he had permission to be on the premises on the occasion of the search at issue.[22]

■ As we synthesize these cases, then, it is clear to us that an overnight guest's expectation of privacy is affected by the host's ability to control the use of the premises and the period of time that a guest will be permitted to stay. And as *Olson* and other leading Fourth Amendment decisions dictate, we must consider not simply whether appellant had some subjective privacy interest in the premises (he almost always will), but whether, once he had been instructed to gather his belongings and leave the premises, society would view his claim of privacy as reasonable.[23] The cases indicate that our social traditions—that is, the customs and habits that characterize the relationship of guest

**18.** 73 Ark.App. 399, 44 S.W.3d 751, (2001). *But cf. State v. Lara*, 258 Neb. 996, 607 N.W.2d 487, 491, *cert. denied*, 531 U.S. 875, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000) (holding that defendant's status as an overnight guest was sufficient for standing to contest a search even where the host had given police permission to search, but not analyzing whether consent countermanded the guest's expectation of privacy).

**19.** 114 F.3d 29, 31–32 (4th Cir.1997).

**20.** 220 Wis.2d 705, 583 N.W.2d 668, 671–72 (Ct.App.1998).

**21.** 640 S.W.2d 40, 46 (Tenn.Crim.App.1982). The defendant in *Turnbill* was not evicted by the friend who agreed to share the room at the mission with the defendant and the defendant's girlfriend. Rather, he was evicted by the mission director, who also managed the apartments that the mission operated. *Id.* at 44.

**22.** *See* 5 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 11.3(b), at 144 (3d. ed.1996) (stating that the "burden is on the defendant to establish that his presence was not wrongful" and that "what is required is a showing that a person authorized to do so gave permission for the defendant to be present on that particular occasion.")

*Cf. State v. Arias*, [283 N.J.Super. 269,] 661 A.2d 850, 856 (N.J.Super. Ct. Law Div.1992) (finding no reasonable expectation of privacy where the defendant intruded upon a home and held the occupants of the home hostage for 28 hours, thus making defendant the "ultimate uninvited guest"); *State v. Brown*, 575 So.2d 763, 764–65 (Fla.Dist.Ct.App.1991) (finding no reasonable expectation of privacy where the defendant "was on the premises by sufferance more than by invitation" and where the defendant was not invited by the apartment owner, could not give the address of the apartment, was there for only a few minutes and did not have any possessions on the premises).

**23.** *See Villarreal*, 935 S.W.2d at 138.

and host in our culture—do not favor such a broad and charitable view of the reasonableness of one's expectation of privacy. Accordingly, we hold that once a person has been asked to leave the premises by one with authority to exclude him, and where that person has a reasonable opportunity to gather his personal effects prior to leaving, any expectation of privacy that he maintains in the premises is no longer one that society would view as reasonable.

Katherine asked appellant on several occasions to leave her apartment. Appellant, moreover, understood this request, for it was precisely this request that appeared to inflame him prior to his attack on Katherine and Anthony. Katherine gave appellant several opportunities to gather his belongings and vacate the apartment before the attack, and nearly twelve hours passed between the time Katherine asked him to leave and the time of the police intrusion. Appellant took normal precautions to protect his privacy (such as locking the front door and ignoring visitors) and he put the place to some private use. Nevertheless, aside from keeping his belongings in the apartment and establishing phone service in his name, appellant had no other property or possessory interest in the apartment itself; because he had been asked to leave, he was not legitimately in the apartment when the search occurred; he did not have dominion over the apartment with the right to exclude others; and, as we have explained in detail, his claim is not consistent with historical notions of privacy. Given these facts, appellant has failed to meet his burden of showing that his expectation of privacy was objectively reasonable. Appellant therefore lacks standing to challenge the search of the apartment and his fifth point of error is overruled.

## C.

In a related point of error, his fourth, appellant argues that the trial court erred in admitting Corporal Brunson's testimony at the suppression hearing concerning what Officer Vasquez had told him after a phone conversation with Elizabeth Ojeda prior to the police entry into the apartment.[24] Appellant argues that Corporal

---

**24.** The following exchange occurred at the suppression hearing, after Corporal Brunson testified that he had just arrived at the apartment and had observed Officer Vasquez speaking on his cellular phone:

DISTRICT ATTORNEY: Do you know who he was speaking to at that time?

CORPORAL BRUNSON: He was speaking with a family member of a Katherine Jiminez, was the—reported to be the occupant of 3206.

DISTRICT ATTORNEY: Do you know what Officer Vasquez learned during that conversation?

DEFENSE COUNSEL: Your Honor, I'm going to object to that as rank hearsay.

DISTRICT ATTORNEY: Judge, these are not offered for the truth of the matter asserted, but for the basis upon which the officers acted, and hearsay is admissible during a Motion to Suppress hearing.

COURT: Overruled.

CORPORAL BRUNSON: Officer Vasquez was relaying information to me as he was speaking on the telephone. The window to his car was down, and I believe the door was ajar.

DISTRICT ATTORNEY: What did you find out at that time?

CORPORAL BRUNSON: I found out that the family of Katherine Jiminez had not heard from her since the previous day. The information I had at that time was that one of her children was left with the family, and that they had attempted to make contact with her by telephone and by knocking on the apartment door, that—

DISTRICT ATTORNEY: Did you—let me— did you later find out that it wasn't that the child was left with the family, but had not been dropped off with the family?

CORPORAL BRUNSON: Yes.

DISTRICT ATTORNEY: But at that time you believed there was a child involved?

CORPORAL BRUNSON: Yes.

Brunson's statement was inadmissible hearsay. He relies exclusively upon our decision in *McVickers v. State*,[25] in which the officers who actually stopped an automobile did not testify at the suppression hearing. Rather, the only officer who testified at the hearing there was the officer who later took the defendant into custody, but who was *not present* at the time of the stop and thus could rely only upon the statements of the stopping officers in discussing the reasons for the stop.[26]

■ In *McVickers*, we held that the rules of evidence apply at a hearing on a motion to suppress evidence.[27] We based this holding upon the language of Texas Rule of Criminal Evidence 1101(d)(4), which provided:

In the following proceedings these rules apply to the extent matters of evidence are not provided for in the statutes that govern procedure therein or in another court rule prescribed pursuant to statutory authority:

* * *

(4) Motions to suppress confessions, or to suppress illegally obtained evidence under Texas Code of Criminal Procedure article 38.23.[28]

Former rule 1101(d)(4) was not incorporated into the current rules of evidence. Absent that provision, the controlling rule is Texas Rule of Evidence 101(d)(1)(A), which provides:

These rules, except with respect to privileges, do not apply in the following situations:

(A) the determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.

In turn, Rule 104(a) provides:

Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

Because suppression hearings involve the determination of preliminary questions concerning the admissibility of evidence, the language of the current rules indicates that the rules of evidence (except privileges) no longer apply to suppression hearings. This conclusion is consistent with the United States Supreme Court's interpretation of the Federal Rules of Evidence, which has a counterpart to Rule 104(a) but has never had a counterpart to former Rule 1101(d)(4).[29]

The dissenting opinion says, mistakenly, that we overrule *McVickers* and then uses this misconception to accuse the Court of ignoring the doctrine of *stare decisis*. While it is true that *McVickers* is no long-

25. 874 S.W.2d 662 (Tex.Crim.App.1993).

26. *Id.* at 663.

27. *Id.*

28. *Id.* at 665–666.

29. *Matlock*, 415 U.S. at 173–174, 94 S.Ct. 988 (Proposed Federal Rule of Evidence 104(a) confirmed that the rules governing trial do not govern the determination of preliminary questions, including Fourth Amendment issues determined at a suppression hearing; hearsay is admissible in such a proceeding); *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial"; citing *Matlock, Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), and Federal Rule of Evidence 104(a)).

The consequences predicted by the dissenting opinion have not occurred in federal court.

er the law, that is simply because the rule upon which it was based—Rule 1101(d)(4)—no longer exists. Although the dissent recognizes that *McVickers* relied upon former Rule 1101(d)(4), the dissent nevertheless maintains that "[i]t was our holding in *McVickers*, and *not* the Rules of Evidence by virtue of a force outside of our holding, that made the rules applicable to suppression hearings." But we could arrive at our holding in *McVickers* only because Rule 1101(d)(4) existed. Without that rule, the basis for *McVickers's* holding vanishes. And that is precisely why our treatment of motions to suppress under *McVickers* differed from that of the federal courts—without a counterpart to Rule 1101(d)(4), Rule 104(a) controls for motions to suppress, and as a result, federal trial judges are not bound by the rules of evidence in motion to suppress hearings.

Our caselaw does not characterize decisions based upon changes in the rules as "the overruling of precedent." For example, we did not "overrule" past cases in *Fowler v. State* after the harmless error rule for nonconstitutional errors was changed by a revision in the Rules of Appellate Procedure; former Rule 81(b)(2)'s "harmless beyond a reasonable doubt" standard was simply no longer applicable to nonconstitutional errors.[30] When Rule 34.6(f)(3) superceded the former Rule 50(e), regarding missing records on appeal, we did not "overrule" prior cases that had interpreted Rule 50(e).[31] In

*McVickers* itself, we did not "overrule" *Adams*,[32] upon which the State relied, but simply said that it was not controlling because of the later enactment of Rule 1101(d)(4).[33]

The dissenting opinion also criticizes the Court for arriving at this holding in the absence of a request from either party to do so. We are a first-level appellate court in death penalty cases. We can affirm on any basis, whether raised by the parties or not. The dissent claims that the instant appeal is an "unfortunate choice" of forums in which to "overrule" *McVickers*, because this case is a complex capital murder trial and *McVickers* is allegedly distinguishable. Again, we do not overrule *McVickers;* we simply recognize that the rule upon which *McVickers* was based was deleted from the Rules of Evidence. And for us to distinguish *McVickers* without pointing out the change in the rule would leave the implication that *McVickers's* holding somehow survived the deletion of the rule upon which it was based.[34] Nor do we see how the "complexity" of the case or its status as a capital murder prosecution require that we refrain from addressing the effect of the change in the rules of evidence.

The dissent contends that the parties relied upon the old rule and will now be surprised by our holding. Presumably, however, the parties were aware—or ought to have been aware—that Rule

---

30. 991 S.W.2d 258 (Tex.Crim.App.1999).

31. *Issac v. State,* 989 S.W.2d 754 (Tex.Crim.App.1999).

32. *Adams v. State,* 552 S.W.2d 812 (Tex.Crim.App.1977).

33. We also said the facts in *Adams* were distinguishable because in *Adams* we did not address the admissibility of hearsay evidence through the testimony of third persons, for

purposes of showing what led other, non-testifying, officers to believe probable cause existed. That is the exact basis upon which we distinguish this case from *McVickers*.

34. Moreover, the dissent's contention that we should avoid the issue of *McVickers's* continuing vitality if the case can be distinguished is ironic since the dissent ultimately concludes that *McVickers* is not distinguishable.

1101(d)(4) had been deleted and that federal caselaw interpreted Federal Rule 104(a)(upon which Texas Rule 104(a) was based) at variance with the holding in *McVickers*. *McVickers* itself makes it fairly clear that, absent Rule 1101(d)(4), we would have decided the case in conformity with caselaw interpreting the federal counterpart to our Rule 104(a), as we do today. In saying that we overrule *McVickers,* the dissent sets up a strawman that gives the dissent free rein to criticize the Court at great length for overruling precedent. *McVickers* is not overruled; it simply is no longer controlling. The dissent's comments about *stare decisis* are inapt.

The dissent contends that this opinion is an example of "rewriting the law." But the law was "rewritten" long before this opinion: it was rewritten when the Rules of Evidence were changed to delete Rule 1101(d)(4). The dissent claims that we ought to wield our power, "not aggressively, but gently, carefully and with an eye to this Court's role as the caretaker of Texas's criminal laws." We agree. That is why we interpret our rules in conformity with the Supreme Court's interpretation of Federal Rule 104(a), upon which our Rule 104(a) is based. The dissent also castigates the Court for confusing what we can do with what we should do. But it is the dissent that would depart from the Supreme Court's interpretation, and also simply ignore the deletion of Rule 1101(d)(4), because "this Court is free to outline the rules' parameters in the manner we see fit."

The dissent contends that Rule 104(a)'s language does not lead to the conclusion drawn by both this Court and the United States Supreme Court because the "preliminary questions" addressed by the rule

"smack of *legal* issues, where the reliability of the evidence itself is not what determines the outcome." The dissent's conclusion is at odds with the Federal Advisory Committee's comments on Federal Rule 104(a):

> The applicability of a particular rule of evidence often depends upon the existence of a condition. Is the alleged expert a qualified physician? Is a witness whose former testimony is offered unavailable? Was a stranger present during a conversation between attorney and client? In each instance the admissibility of evidence will turn upon the answer to the question of the existence of the condition. Accepted practice, incorporated in the rule, places on the judge the responsibility for these determinations. [Citation omitted]. To the extent that these inquiries are factual, the judge acts as a trier of fact.... If the question is factual in nature, the judge will of necessity receive evidence pro and con on the issue. The rule provides that the rules of evidence in general do not apply to this process.

The qualification of an expert to testify, the satisfaction of a hearsay exception, and the predicate for claiming an attorney-client privilege are all admissibility questions that may involve subsidiary fact issues to be resolved by the trial judge, and the judge is not bound by the rules of evidence in making those determinations.

■ Even if the rules of evidence had applied to the motion to suppress hearing, however, this case is distinguishable from *McVickers*. The disputed testimony in this case was admitted, not for its truth, but to explain the basis for subsequent conduct of Corporal Brunson and the other officer.[35] In *McVickers*, on the other

---

**35.** See Tex.R. Evid. 801(d): " 'Hearsay' is a statement, other than one made by the declar-

ant while testifying at the trial or hearing,

hand, the statement was offered to show the basis of someone else's conduct. Here, the officer who determined probable cause testified at trial. In *McVickers* he did not. The dissenting opinion's failure to distinguish the situation in this case from that in *McVickers* could be based on a misconception. The dissent says, mistakenly, that Corporal Brunson testified as to the facts that Officer Vasquez believed constituted probable cause. He did not. There is no testimony that Officer Vasquez believed there was probable cause. Corporal Brunson testified as to the facts that *he himself* believed constituted probable cause. In this case, the testifying officer was involved in the conduct and so his testimony was not hearsay. He perceived the events that formed the basis for his determination that probable cause existed. The fact that the other officer may have come to the same conclusion from his observation of those events does not negate the usefulness of the evidence to explain *Brunson's* probable cause determination. And, Brunson was in a position to observe the other officer; so, Brunson's testimony related to what he observed and not to what another officer may have told him after the fact. However, even if Brunson's testimony were hearsay as to another officer's conduct, that would mean only that a limiting

instruction would be required—not that the evidence was inadmissible. Appellant's fourth point of error is overruled.

## II.

■■■ In his first three points of error, appellant contends that the trial court erred in granting the State's challenges for cause regarding three members of the venire. The State may challenge for cause a veniremember who has a bias or prejudice against the defendant[36] or "any phase of the law upon which the State is entitled to rely for conviction or punishment."[37] Jurors must be able to consider the full range of punishment provided by law for the crime charged.[38] In a capital prosecution, a prospective juror is not subject to a challenge for cause merely because he is opposed to or has "conscientious scruples" regarding the death penalty.[39] A veniremember, however, is subject to a challenge for cause if his views regarding the death penalty would "prevent or substantially impair the performance of his duties in accordance with his instructions and his oath."[40] Similarly, and more generally, a veniremember is subject to a challenge for cause if his beliefs or opinions would prevent or substantially impair his ability to carry out his obligations as a juror.[41] In

offered in evidence *to prove the truth of the matter asserted*" (emphasis added).

**36.** TEX.CRIM. PROC.CODE Art. 35.16(a)(9); *Smith v. State*, 907 S.W.2d 522, 529 (Tex.Crim.App. 1995) (holding that a prospective juror with bias or prejudice against the parties in the case must be excused for cause).

**37.** TEX.CRIM. PROC.CODE Art. 35.16(b)(3). The State may assert grounds for a challenge that are not included in Article 35.16 where the challenge is based on facts demonstrating that the prospective juror would be incapable of or unfit for jury service. *See Mason v. State,* 905 S.W.2d 570, 577 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 670 (1996).

**38.** *Sadler v. State,* 977 S.W.2d 140, 142 (Tex. Crim.App.1998).

**39.** *Witherspoon v. Illinois,* 391 U.S. 510, 515, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**40.** *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Smith,* 907 S.W.2d at 527.

**41.** *Sadler,* 977 S.W.2d at 142; *Zimmerman v. State,* 860 S.W.2d 89, 95 (Tex.Crim.App. 1993), *cert. denied,* 513 U.S. 1021, 115 S.Ct. 586, 130 L.Ed.2d 500 (1994). *See also Smith,* 907 S.W.2d at 529 (holding that a prospective juror who expresses an inability to be fair to

determining whether the trial court abused its discretion in ruling on a challenge for cause, where it possessed such discretion, we review the voir dire record in its entirety and ask whether the court had a rational basis for its conclusions.[42] Where the veniremember either vacillates or equivocates on his ability to follow the law, we defer to the trial court's judgment on the challenge for cause.[43]

### A.

■ Over appellant's objection, the trial court granted the State's challenge for cause of veniremember Blanchette. The State argued that she could not be fair to the parties because of her opposition to capital punishment and her racial bias. During the State's examination, Blanchette admitted that her religious beliefs led her to oppose the death penalty. Blanchette stated that she could not determine appellant's guilt or innocence because "my decision would catapult the whole thing into the next phase (the sentencing phase)." She stated that she would always conclude that mitigating circumstances existed in order to effect a life, rather than a death, sentence and admitted that because of her views she could not be fair to the State. Appellant's counsel then examined Blanchette. During the defense's examination, she stated that she would not want to be dishonest and, if selected, would follow the law, but "that's why I don't want to be a participant because I can't—you know, I

can't do that, what [the judge] is requiring to be done." Blanchette then explained to appellant's attorney her bias against Mexican American men, the fact that her husband's Mexican American stepfather abused her husband when he was young, and that Blanchette herself has been abused as a child. When appellant's counsel asked her, "Would it be fair to say you just don't think you could be a fair juror to anybody in this case?," she responded, "I just—it feels too close to what I have experienced in my childhood."

The trial court properly excused Blanchette for cause under either of the State's theories. Although she stated once that she would follow instructions if selected, she subsequently said that she could not do "what [the judge] is requiring to be done." Furthermore, Blanchette indicated her personal bias against Mexican American men and conceded that her bias would affect her ability to be a fair juror.[44] For these reasons, the trial court did not abuse its discretion in granting the State's challenge for cause. We overrule appellant's first point of error.

### B.

■ The trial court also granted the State's challenge of veniremember Andrea Crawford for cause. When examined by the State, Crawford said she did not want to serve on the jury because she opposed the death penalty. Initially, she stated

the state is biased in favor of the defendant and is challengeable for cause).

**42.** *Howard v. State*, 941 S.W.2d 102, 116 (Tex. Crim.App.1996).

**43.** *Brown v. State*, 913 S.W.2d 577, 580 (Tex. Crim.App.1996); *Garcia v. State*, 887 S.W.2d 846, 854 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).

**44.** As the record indicates, appellant is Hispanic, although not Mexican American. The record is also clear that Blanchette did not distinguish the two terms. *See, e.g.*, RR VII at 76 ("My husband's stepfather was a Mexican American man, a Hispanic, and there was a lot of abuse in his home"). Therefore, the fact that appellant is not Mexican American is not dispositive of the question of Blanchette's bias; rather, it is crucial that Blanchette believed her bias against Mexican–American men included Hispanics, such as appellant.

that she would be unable to render a verdict in the guilt/innocence phase because of the possibility that a conviction would lead to a death sentence. She also stated that her opposition to capital punishment would "probably prevent" her from answering the future dangerousness question during the sentencing phase. Meanwhile, upon questioning by both the State and appellant, Crawford also said she could take the oath and follow the court's instructions. Then, upon re-examination by the State, Crawford explained, "If I was called, I would have to follow the law; but personally I cannot do it, personally I cannot do it. I don't want anything on my conscience that would bother me for the rest of my life possibly." When the trial judge attempted to clarify the law for Crawford and discern the precise nature of her feelings, Crawford said she would follow the law if called, but that doing so would "upset" her. The court denied the challenge.

The State then began another series of questions. The following exchange took place:

DISTRICT ATTORNEY: And I believe that I understand what you're saying is that even though it might be okay for society to do this, you personally do not wish to participate. And I thought what you told me is that you could not?

VENIREMEMBER: I personally could not.

. . .

DISTRICT ATTORNEY: And so if you can't do it, even though you would want to follow the law, those are two different things. Everybody thinks of themselves as a law abiding citizen, and everybody would want to follow a Judge's instructions if they were to serve on a jury, but occasionally there comes a time when jurors feel so strongly about an issue that it reaches

that point, and they have such a moral conflict that they simply cannot follow those instructions, no matter how much they want to.

VENIREMEMBER: And that probably would be the same situation with me. It's just—if I don't have to—if I was picked to call on the jury I would have to do it, but it would just eat me up inside, and I don't want that on my conscience. But yet if I was called, I would have to do it.

DISTRICT ATTORNEY: Well, I guess what I'm asking then is do you think that you are one of those people who feels so strongly that even though you would believe that you would have to if you were called, that there would exist such a conflict that it would prevent you from participating in the process, either by refusing to vote or by somehow distorting the evidence so that you could answer the questions such that you would know that a life sentence would be imposed instead of a death penalty?

VENIREMEMBER: Yes.

DISTRICT ATTORNEY: So, you would be tempted to—

VENIREMEMBER: I would probably refuse to vote.

The trial court then granted the State's renewed challenge for cause, over appellant's objection.

Crawford was a vacillating juror. On many occasions, she stated she *would* follow the court's instructions if she were called for service. But she also stated that her feelings would lead her either to refuse to vote or to distort the process to produce a life sentence rather than a death sentence. In the case of a vacillating veniremember such as Crawford, we defer to the decision of the trial court, which was in a position to actually see and hear the

veniremember in the context of the voir dire.[45] Viewing the voir dire in its entirety, we conclude that the trial court here had a rational basis for concluding that Crawford's personal feelings would substantially impair her ability to be fair to the State and to follow the court's instructions and her oath. We overrule appellant's second point of error.

## C.

■■■ Finally, the trial court granted the State's challenge of veniremember Budewig for cause. Budewig stated his opposition to capital punishment but stated that he would follow the trial court's instructions if asked to serve. His answers, however, ultimately reflected an uncertainty as to whether he could provide answers to the special issues that would lead to a death sentence. On examination by the State, the following exchanges occurred:

> DISTRICT ATTORNEY: Well, what reality is that there are some laws that even though citizens are law abiding people in every other respect, that they so strongly disagree with, that if placed in the position they simply could not follow that particular law, and I'm trying to find out if you are one of those people.

> VENIREMEMBER: Yes, I think I am one of those people.

> . . .

> DISTRICT ATTORNEY: So, in a death penalty case, essentially what you're telling me and the Judge is that this is one—maybe the only law that you could not follow.

> VENIREMEMBER: Yes, I think so. I have never been confronted with this before. I have been called to jury service many, many times, and I have been seated twice. This is the first time I have ever had to deal with this, and this is the first time I have really had to—I told my wife I discussed this with other people, I—I could not do it.

Appellant then asked Budewig a series of questions to clarify his position. At this point, Budewig conceded that he could answer the questions at the punishment phase "yes" or "no," depending upon what the evidence demonstrated. The trial court initially denied the State's challenge for cause, but sought further clarification from Budewig. The following exchange then occurred:

> TRIAL COURT: . . . What I'm saying is if the answers to those questions in your mind should be answered "yes" and "no," then would you say "no, I'm not going to vote what I believe, I'm going to vote against what I believe because I don't want the death penalty"? That's really where we are coming from.

> VENIREMEMBER: I think—I think I'm trying to sugar coat. I think I'm not giving straight answers. I cannot vote for the death penalty.

45. *Brown,* 913 S.W.2d at 580–81; *Garcia,* 887 S.W.2d at 854. We have held that a veniremember is not vacillating merely because he has difficulty following the law or because doing so would violate his conscience, where the veniremember consistently reaffirms his ability to answer questions according to the evidence. *See Clark v. State,* 929 S.W.2d 5, 7 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997); *Riley v. State,* 889 S.W.2d 290, 300 (Tex.Crim.App.1993), *cert. denied,* 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995). Here, however, Crawford went beyond merely stating her difficulty with the task and her desire to keep a clear conscience. She actually admitted that her feelings would influence her ability to perform her function as a juror. This statement, when contrasted with her statements that she would follow the law if called to serve, transformed Crawford into a vacillating juror who was excludable at the court's sound discretion.

. . .

VENIREMEMBER: And I can see where I could have a great deal of moral conflict there. And I'm—I think I better just come and say "no, I can't do this process."

The trial court then granted the State's challenge for cause.

Budewig was a vacillating juror. According appropriate deference to the trial court's decision, we hold that the court did not abuse its discretion in granting the State's challenge for cause.[46] We overrule appellant's third point of error.

## III.

▮▮▮ In his sixth point of error, appellant claims the trial court should have made inquiry of a juror who appellant believed had committed misconduct because the juror demonstrated bias. In his seventh point of error, appellant argues that the trial court should have granted appellant's motion for a mistrial after learning of the juror's conduct.

After the jury had convicted appellant of capital murder, but before the start of the punishment phase, juror Merl Breckenridge tendered a note to the trial court that said, "I would like to read these references to my fellow jurors if possible, or would this violate church-state separation? Thank you. Breckenridge." Juror Breckenridge attached to the note a definition of murder and thirteen Bible verses relating to murder and the penalty of death.[47] The court denied Breckenridge's request to

---

46. *King v. State*, 29 S.W.3d 556, 568 (Tex. Crim.App.2000).

47. The attachment read as follows:

MURDER—The malicious killing of a human being. In virtually all times and civilizations, murder has been recognized as a cardinal offense against society. Killings done in accident or in the defense of life are not to be regarded as murders. In the sixth commandment of the Decalogue, the verb translated "kill" is best translated "murder", and does not refer to killing to avenge a murder, to capital punishment, or to killing in a war. The concern here is with the protection of human life within the community. Jesus struck at the heart of murders when he condemned even the attitudes which, when fully developed, lead to murders.

Scripture:

Genesis 4:9–11. The Lord said, What hast thou done? The voice of thy brother's blood crieth unto me from the ground. And now art thou cursed from the earth, which hath opened her mouth to receive thy brother's blood from that hand;

Genesis 9:6. Whoso sheddeth man's blood, by man shall his blood be shed; for in the image of God made he man.

Exodus 20:13. Thou shalt not kill.

Numbers 35:16. And if he smite him with an instrument of iron, so that he die, he is a murderer; the murderer shall surely be put to death.

Numbers 35:30. Whoso killeth any person, the murderer shall be put to death by the mouth of witnesses; (31) Moreover ye shall take no satisfaction for the life of a murderer, which is guilty of death; but he shall surely be put to death.

Matthew 5: 21–22. Ye have heard that it was said by them of old time, Thou shalt not kill; and whosoever shall kill shall be in danger of the judgment. But I say unto you that whosoever is angry with his brother without a cause shall be in danger of the judgment.

Matthew 15:19. Out of the heart proceed evil thoughts, murders . . .

Matthew 19:18. He saith unto him, Which? Jesus said, Thou shalt do no murder.

I Timothy 1:9. Knowing this, that the law is not made for a righteous man, but for the lawless and disobedient, for the ungodly and for sinners, for unholy and profane, for murderers of fathers and murderers of mothers, for manslayers.

James 2:11. For he that said, Do not commit adultery, said also, Do not kill. Now if thou commit no adultery, yet if thou kill, thou art become a transgressor of the law.

I Peter 4:15. Let none of you suffer as a murderer.

read the verses to the jury. The court then conducted an inquiry. It heard argument from counsel both for the State and for appellant and called the court bailiff to testify on the record as to how the bailiff had received the note. Upon questioning by the trial court, the bailiff testified that Breckenridge handed the note to the bailiff outside the jury room and outside of the hearing of other jurors, and asked the bailiff to take it to the trial judge. The note was placed in a manila folder. Neither party asked questions of the bailiff. Appellant then requested that the court make inquiry of Breckenridge to determine whether he had already concluded that appellant should receive the death penalty, prior to hearing evidence at the punishment phase. Appellant also argued that Breckenridge had improperly consulted an outside source. The court denied the request, saying that it would be improper and unconstitutional to instruct jurors that they cannot consult books of faith in times of spiritual need. The court also explained that there was no evidence that Breckenridge had already decided appellant's fate and that not all of the verses Breckenridge listed indicated a preference for capital punishment. The court then denied appellant's motion for mistrial based on juror misconduct, and gave written instructions to Breckenridge that he could not refer to or discuss "any matter or issue not in evidence," that he could receive evidence only from the witness stand, and that in making a punishment determination he could consider all facts admitted into evidence at both phases and all of the law that the court submitted in its charge.

▇▇▇▇▇ A juror who is ultimately guided by his personal beliefs rather than the law is not qualified to sit on a jury.[48] It does not follow, however, that a juror with strong personal beliefs is necessarily biased, that is, incapable of following the court's instructions and the juror's oath. Our cases demonstrate that many citizens who, during voir dire, openly confess strong beliefs either in favor of or against capital punishment qualify to sit on capital juries.[49] Thus, a juror need not shed his personal convictions regarding the death penalty at the door to the jury room. A juror must, rather, use the law, the evidence, and the trial court's mandates as his ultimate guides in arriving at decisions as to guilt or innocence and as to punishment. If he possesses an inclination toward or against imposing capital punishment that prevents or substantially impairs his ability to make decisions based on the law and the evidence of the case before him, then the juror is biased.[50]

▇▇▇▇▇ We have said that where a sitting juror makes statements outside of deliberations that indicate bias or partiality, such bias can constitute jury misconduct that prohibits the accused from receiving a fair and impartial trial.[51] Thus,

---

I John 3:15. Whosoever hateth his brother is a murderer: and ye know that no murderer hath eternal life abiding in him.
Revelations 21:8. Murderers ... shall have their part in the lake which burneth with fire and brimstone; which is the second death.
(boldface in original).

48. *Castillo v. State*, 739 S.W.2d 280, 296 (Tex. Crim.App.1987), *cert. denied*, 487 U.S. 1228, 108 S.Ct. 2889, 101 L.Ed.2d 924 (1988).

49. *See, e.g., Clark*, 929 S.W.2d at 7; *Garcia*, 887 S.W.2d at 858–59.

50. *See Patrick v. State*, 906 S.W.2d 481, 489 (Tex.Crim.App.1995).

51. *See Quinn v. State*, 958 S.W.2d 395, 402 (Tex.Crim.App.1997); *Norman v. State*, 588 S.W.2d 340, 347 (Tex.Crim.App.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). *Quinn*, upon which the

although "it defies common sense and human nature to require that a juror have no impressions or opinions until the judge send the jury to deliberations,"[52] where a juror's statements or conduct raise a question as to whether he is biased, "an inquiry is appropriate to determine the juror's intent when making the statement."[53] On such an inquiry, the trial court retains discretion in determining whether a juror is biased and we will review the court's decision in the light most favorable to its recorded findings.[54] The trial court also has discretion in determining whether to grant a motion for a mistrial based on allegations of juror misconduct.[55]

The attachment to Breckenridge's note indicated nothing more than the religious foundations for Breckenridge's support of capital punishment (which he freely confessed during voir dire);[56] nothing in the note or attachment suggests that Breckenridge had already decided the fate of *this* particular defendant. Nevertheless, recognizing that the note and attachment might raise a reasonable question about Breckenridge's ability to make the sentencing determination solely on the law

and the evidence applicable to appellant's case, the court prudently conducted an inquiry. After it denied Breckenridge's request, the court called the bailiff, who testified as to Breckenridge's comments when handing the bailiff the folder, and heard argument from both the State and appellant. In denying appellant's requests, the court concluded there was no indication, based on either the note or the attachment, that the juror had already decided on a death sentence or that he had improperly referred to an outside source. Rather, the juror simply had "go[ne] to his source of faith in times of trial" and the court would not prohibit him from, or question him about, doing so. The court made clear that Breckenridge could not discuss his attached note with the other jurors and that he make his decision solely upon the law and the evidence. The court's inquiry was sufficient to determine that Breckenridge was not biased against this appellant. Importantly, our juror misconduct precedents have permitted but not required examination at a hearing of jurors accused of misconduct,[57] and the

---

appellant relies heavily, involved a juror who, after the State's case on guilt/innocence but before the defendant's, spoke with a co-worker about the case. At a hearing on the defendant's motion for new trial, the juror testified that he had not decided the case and could be impartial. The trial court denied the motion on this ground, and we affirmed. *Quinn*, 958 S.W.2d at 403. *Cf. Bartell v. State*, 464 S.W.2d 863, 865 (Tex.Crim.App.1971) (holding that a juror did not commit misconduct arising from bias because she arrived at her verdict through divine guidance); *Mays v. State*, 393 S.W.2d 925, 926–27 (Tex.Crim.App. 1965) (rejecting a claim of juror misconduct arising from bias where juror, during deliberations in a drunk driving prosecution, stated his belief that "if you drink don't drive and if you drive don't drink").

**52.** *Quinn*, 958 S.W.2d at 403.

**53.** *Id.*

**54.** *Id.*

**55.** *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim.App.1998); *Robinson v. State*, 851 S.W.2d 216, 230 (Tex.Crim.App.1991), *cert. denied*, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).

**56.** During voir dire, Breckenridge indicated that he supported capital punishment but did not feel that it should be imposed in every capital case. He also said he would not automatically answer the special issues in such a way as to produce the death penalty. Appellant challenged Breckenridge for cause and the trial court denied the challenge.

**57.** *See Quinn*, 958 S.W.2d at 403 ("an inquiry is appropriate to determine the juror's intent"); *Moody v. State*, 827 S.W.2d 875, 899–900 (Tex.Crim.App.), *cert. denied*, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992) (affirming denial of a motion for mistrial aris-

evidentiary rule that allows juror testimony upon allegations of outside influence or lack of qualification to serve is permissive and not mandatory.[58] Moreover, the court gave adequate instructions admonishing Breckenridge of his responsibilities, and there is no indication that Breckenridge disobeyed those instructions or otherwise attempted improperly to influence the jury's deliberations. The trial court did not err in refusing appellant's request that Breckenridge be questioned, nor did it abuse its discretion in denying appellant's motion for a mistrial. We overrule appellant's sixth and seventh points of error.

Appellant's conviction and death sentence are affirmed.

PRICE and JOHNSON, JJ., concurred in the result.

MEYERS, J., filed a dissenting opinion.

MEYERS, J., filed a dissenting opinion.

In his fourth point of error, appellant challenges the admission of certain testimony at a pretrial suppression hearing. Specifically, appellant complains that Officer Brunson should not have been permitted to testify about statements that were made to another officer by one of the victim's family members. Appellant alleges that the testimony is inadmissible hearsay that should have been excluded pursuant to *McVickers v. State*, 874 S.W.2d 662 (Tex.Crim.App.1993). The State argues that *McVickers* has no application in the instant appeal because *McVickers* is distinguishable. In response to these arguments, the majority holds that *McVickers* is no longer good law and overrules the point of error. *Granados v. State*, 85

S.W.3d 217, 227 (Tex.Crim.App.2002) (hereinafter cited as "Majority Op."). This disposition is incorrect on the merits, and it reaches simultaneously too far by addressing arguments the parties themselves did not advance and not far enough by failing to address the far-reaching ramifications of today's decision. Accordingly, I dissent.

Approximately a decade ago, this Court held in *McVickers* that the rules of evidence apply at a hearing on a motion to suppress. 874 S.W.2d at 666. As the majority notes, our opinion in *McVickers* relied on former Texas Rule of Criminal Evidence 1101(d)(4).[1] The majority also correctly notes that Rule 1101(d)(4) was not incorporated into the Texas Rules of Evidence jointly promulgated in 1997. It then looks to the text of Rule 104(a), which provides:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

From this, the majority concludes that the language of the Rules of Evidence "indicate" that the rules do not apply to suppression hearings. Majority Op. at 227.

Any subsequent dicta to the contrary notwithstanding, the majority's conclusion in this regard overrules *McVickers*. The majority corrects my "misconception" that

---

ing from juror misconduct where a juror and bailiff conversed about the case outside the jury room before deliberations were complete and where bailiff's testimony at hearing was sufficient to rebut any presumption of harm to defendant).

**58.** *See* Tex.R. Evid. 606(b).

**1.** All future references to "rules" are to the Texas Rules of Evidence.

it overrules *McVickers* by stating that, "[w]hile it is true that *McVickers* is no longer the law, that is simply because the rule upon which it is based—Rule 1101(d)(4)—no longer exists." Majority Op. at 228. I stand uncorrected. It was our holding in *McVickers*, and *not* the Rules of Evidence by virtue of a force outside of our holding, that made the rules applicable to suppression hearings. If *McVickers* is no longer the law, *McVickers* has been overruled.

Using the instant appeal as a forum in which to overrule *McVickers* is a particularly unfortunate choice. This is a non-discretionary appeal from a complex capital murder trial in which counsel for appellant raised *seven* separate points of error, each of which we as a "first-level appellate court" were bound to address. *See* Tex. Code Crim. Proc. art. 37.071 § 2(h).[2] More importantly, however, *neither* party to this dispute argued that *McVickers* should be excised from our books. Here, one district attorney from one county argued for relief in this particular case under the law of *McVickers*. Yet the relief granted by the majority extends well beyond that which was requested by the State or necessary to the disposition of appellant's point of error.[3]

This Court has recognized that under the doctrine of *stare decisis*, we generally adhere to past precedent because doing so promotes judicial efficiency and consistency, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. *See, e.g., Jordan v. State*, 54 S.W.3d 783, 786 (Tex. Crim.App.2001). What remains of the ac-

tual or perceived integrity of the judicial process if this Court overrules precedent in the absence of a request for it to do so? What measure of reliance can a party place on our decisions if the decisions are valid through trial and appeal and are then, to the surprise of both parties, summarily removed from the annals of Texas law? And why shouldn't we take notice of the fact that both sides of this dispute relied on *McVickers* as the law of Texas? Such reliance has, on occasion, been taken into account by this Court. In *Busby v. State*, 990 S.W.2d 263 (Tex.Crim.App. 1999), the appellant sought a reexamination of our precedent interpreting Article 31.04 of the Code of Criminal Procedure. When the majority in *Busby* declined to revisit that precedent, it explained:

> Article 31.04 has remained unchanged since *Cockrum [v. State*, 758 S.W.2d 577, 582–83 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989)] was decided in 1988 and was reaffirmed ... in 1994. Moreover, the State may well have relied upon our interpretation in *Cockrum* in determining how to proceed on the venue motion. Hence, even if we believed that appellant's interpretation necessarily followed from the language in Article 31.04 (which we do not), we would find that the interests underlying the doctrine of *stare decisis* are weighty enough, in the present case, to adhere to our decision in *Cockrum*

990 S.W.2d at 267. These "weighty" interests do not always surface, however. Compare, for instance, the passage quoted

---

**2.** All future references to "Articles" are to the Texas Code of Criminal Procedure.

**3.** The majority holds that the Rules of Evidence no longer apply at suppression hearings, but it also goes on to state that the

instant appeal is distinguishable from *McVickers*. Majority Op. at 229–30. If this appeal is distinguishable, and each of the parties assumed *McVickers's* continuing validity, this hardly seems an appropriate opportunity to invalidate *McVickers* altogether.

above with the following excerpt from *Jordan:*

> While accused persons who have relied on our prior cases may lose their ability to have a trial court decide their claims before revocation, they still have an avenue after revocation in which their claims may be heard. Finally, the administration of justice will benefit from streamlining the process and avoiding confusion that would be engendered by the old rule. Hence, our decision will apply retroactively.

*Jordan,* 54 S.W.3d at 787.[4]

Apparently, then, the interests in guiding the State to properly craft a motion to transfer venue would be weightier than those of an accused who stands to have community supervision revoked because, once incarcerated, the accused can file a writ of habeas corpus and, in addition, take comfort in the streamlined process that got him there. I can find no justification for such a disparity. Nor can I understand why the interests of the parties before this Court, who both relied on *McVickers* at trial and on appeal, simply do not factor into the majority's decision.

The majority responds to this complaint by writing, "We are a first-level appellate court in death penalty cases. We can affirm on any basis, whether raised by the parties or not." I must here register my strong disagreement with the notion that what we *can* do as an appellate court is what we *should* do. The authority that this Court has been given by our statutes and by the Texas Constitution is one that ought to be wielded not aggressively, but gently, carefully and with an eye to this

Court's role as the caretaker of Texas's criminal laws. While I understand that we owe deference to the trial court's discretionary rulings, this deference is something altogether dissimilar to the approach taken by the majority in this case: not only deferring to the trial court's ruling, but rewriting the law on which the ruling is based in order to facilitate that deference. I think our discretion as a "first-level appellate court" is broad, but it is not limitless, and I would not rewrite the law in this manner.

Rather, I would uphold *McVickers* and apply the Rules of Evidence to suppression hearings. In determining that the Rules of Evidence do not apply to suppression hearings, the majority affords dispositive weight to the fact that when the rules were jointly promulgated in 1997, Rule 1101(d)(4) was not incorporated. Majority Op. at 227–28. From this the majority concludes that the law upon which *McVickers* was based no longer exists. *Id.* at 228. Yet Rule 1101(d)(4) has been absent from the rules since 1997. By my watch, it is now 2002. In those five or so years, no party, *including* the parties before the Court today, has argued that the Rules of Evidence do not apply to suppression hearings. Rather than considering the meaningful role that the Rules of Evidence play in the suppression hearing context, the majority looks to Rule 104(a) and holds that "the language of the current rules indicates that the rules of evidence (except privileges) no longer apply to suppression hearings." Majority Op. at 227. I do not agree that this is the import of the rules' language.[5]

---

4. *See also Proctor v. State,* 967 S.W.2d 840, 845 n. 5 (Tex.Crim.App.1998) ("[i]t is, of course, within the Court's power to limit the retroactive effect of a decision, but we rarely do so, especially in the absence of briefing, because there is a need to reward the party

(in this case, the State) responsible for convincing the Court to overrule unsound precedent").

5. In this, I am mindful of Supreme Court precedent to the effect that "the same rules of

Rule 104(a) provides that the trial court is not bound by the Rules of Evidence, except those with respect to privileges, on "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence." These questions smack of *legal* issues, where the reliability of the evidence itself is not what determines the outcome. In contrast to the majority, I would not apply Rule 104(a) to suppression hearings, in which the determinations are fact-bound and reliability is of paramount importance. As this Court explicitly and implicitly recognized when it broadened the State's right to appeal an adverse pretrial ruling on a motion to suppress or exclude evidence, a motion to suppress can make or break a case. *See State v. Medrano,* 67 S.W.3d 892, 896 (Tex. Crim.App.2002) ("the purpose of [Article 44.01] is to permit the pretrial appeal of erroneous legal rulings which eviscerate the State's ability to prove its case"). If the State's interests in appealing such an adverse pretrial ruling were sufficiently weighty to override the controlling precedent of *State v. Roberts,* 940 S.W.2d 655 (Tex.Crim.App.1996), as well as three legislative reenactments of the controlling statute, then surely those considerations militate in favor of allowing the accused *some* measure of reliability in determining which evidence may be offered against him at such a crucial stage. The majority, however, chooses to do away the safeguards that the Rules of Evidence provide at a suppression hearing, thereby drastically altering the landscape of future sup-

pression hearings, and perhaps, future trials. Because the dangers inherent in the majority's opinion seem to be unanticipated by the majority itself, I detail them here.

First, without the evidentiary scaffolding provided by the Rules, all evidence is admissible, all evidence is relevant and the discretion wielded by the trial court is discretion incapable of abuse. Although the Code of Criminal Procedure currently permits a suppression hearing to be held on affidavits, affidavits are *sworn statements,* subject to hearsay objections, submitted to the court under penalty of perjury. Tex.Code Crim. Proc. art. 28.01 § 1(6) (Vernon 1989); Tex. Penal Code § 37.02 (Vernon 1994); *State v. Eversole,* 889 S.W.2d 418, 425 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd). Under the majority's reading of the law, there is now nothing to prevent a trial court from deciding the merits of a suppression motion by relying exclusively on an unsworn police report or lab report. No longer must an expert witness at a suppression hearing be qualified. Tex.R. Evid. 702. Nor must the State continue to burden itself by marshaling witnesses who have personal knowledge of the events about which they are testifying. Tex.R. Evid. 602. Taking the majority's holding to its logical extreme, if the trial judge wished to save time, he could simply call himself as a witness and testify in support of the existence of probable cause by reading a newspaper account of the arrest into the record. Tex.R. Evid. 605.[6]

evidence governing criminal jury trials are not generally thought to govern hearings before a judge to determine evidentiary questions . . . ." *United States v. Matlock,* 415 U.S. 164, 173, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Barring an interpretation of our evidentiary rules that offends the United States Constitution, however, this Court is free to

outline the rules' parameters in the manner we see fit.

**6.** I do not allege through these examples that a trial judge *could not* see through the thin veneer of unreliable evidence. I am arguing simply that any evidentiary shortcut that the State or the trial court finds appropriate is now above reproach and, more importantly,

Certainly common sense would counsel against relying on an unqualified expert witnesses, or a witness without personal knowledge, or against the trial judge taking the stand at a suppression hearing; but such common sense ideas are *rules* only in the Rules of Evidence. Therefore, they will no longer exist as such in the context of suppression hearings. Majority Op. at 227. Additionally, because removing the rules from suppression hearings unfetters the trial court's discretion altogether, the exercise of that discretion will evade appellate review. Now, so long as there is some evidence in favor of the ruling on the motion to suppress, regardless of how unreliable that evidence might be, the trial judge cannot abuse his discretion. This broad reading of the Rules of Evidence may in large part read the Constitution out of a criminal trial by permitting the State to offer evidence against the defendant that was gathered based on non-existent consent or probable cause.

Finally, the majority opinion will change the world of negotiated pleas as we know it. The effect of our law was formerly that appeal could not be taken from a plea of guilty or nolo contendre except as to jurisdictional defects. *Helms v. State*, 484 S.W.2d 925 (Tex.Crim.App.1972). The "Helms rule" had the corollary effect of barring the appeal of any pretrial ruling if the defendant later entered a plea of guilty or nolo contendre. *See* Kevin Yeary, *Appeals from Pleas of Guilty and Nolo Contendre: History and Procedural Considerations*, 33 St. MARY's L.J. 405, 411 (2002) (hereinafter "Yeary"). In 1977, however, the Legislature effectively abrogated the *Helms* rule with respect to non-negotiated pleas by passing former Article 44.02 of the Texas Code of Criminal Procedure. Act of June 10, 1977, 65th Leg., R.S., ch. 351, 44.02, 1977 Tex. Gen. Laws 940;

Yeary at 412. Former Article 44.02 granted a defendant who had entered a plea of guilty or nolo contendre a limited right of appeal. Part of this right was the right to appeal "those matters which have been raised by written motion filed prior to trial." *Id.*

This legislative amendment was eventually incorporated into Texas Rule of Appellate Procedure 25.2, which provides that a plea bargaining defendant who has been sentenced within the prosecutor's recommendation may appeal only if the notice of appeal specifies, *inter alia*, that the appeal is for a jurisdictional defect, that the trial court has given permission to appeal, or that the appeal is taken from a matter raised in a written motion and ruled upon prior to trial. Tex.R.App. P. 25.2(b)(3). Because the effect of the majority's opinion is to thoroughly hamstring appellate review of a trial court's ruling on a suppression motion, there is no longer any real incentive for a defendant, whose primary dispute is with the legality of the evidence offered against him, to agree to a plea bargain. A defense attorney will henceforth have essentially no choice but to hail the State, the trial judge, the defendant and a jury into the courtroom for a full trial in the hopes of litigating issues related to the motion to suppress under the protective net of the Rules of Evidence. He will, after all, have nothing to lose. Indeed, he stands only to gain from a full trial: if nothing else, it will permit him to build a better trial record. Without so much as mentioning it, then, the majority has readjusted the incentives to enter a negotiated plea bargain so that they are strangely similar to the incentives under the Helms rule. As this Court noted upon the passage of former Article 44.02 of the Code of Criminal Procedure:

beyond the reach of meaningful appellate re-      view.

Such a procedure [a limited right of appeal on a negotiated plea] may be expected to conserve judicial resources by encouraging guilty pleas in cases where the only contested issue between the parties is some matter such as the lawfulness of a search, voluntariness of a confession, competency to stand trial, sufficiency of the indictment, or other matter that may be raised by written motion filed prior to trial.

*Ferguson v. State*, 571 S.W.2d 908, 910 (Tex.Crim.App.1978). And so it was until today's decision by the majority.

In conclusion, to the extent the majority applies *McVickers*, it does so incorrectly. Immediately following its statement that the disputed testimony here was admitted "to explain the basis for subsequent conduct of Corporal Brunson and the other officers," the majority goes on to "differentiate" *McVickers* by declaring that "[i]n *McVickers*, on the other hand, the statement was offered to show the basis of someone else's conduct." Majority Op. at 229. If Corporal Brunson was explaining the subsequent conduct of other officers, even if he was simultaneously explaining the basis for *his* conduct, his testimony as to the basis for the other officers' conduct constitutes hearsay. This case is no different from *McVickers*. In *McVickers*, an officer who ultimately *arrested* the defendant testified as to another officer's basis for initially stopping the defendant. *McVickers*, 874 S.W.2d at 663. Here, Corporal Brunson testified as to the facts that Officer Vasquez believed constituted probable cause to enter the victim's residence. *McVickers* should have operated to exclude Brunson's testimony. The admission of the testimony was, therefore, error. Moreover, appellant was harmed. The erroneous admission of Brunson's testimony legitimized the ensuing warrantless search. The admission of the fruits of the search, in turn, had a substantial and injurious effect in determining the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (defendant's "substantial rights" are affected for purposes of harmless error analysis under Texas Rule of Appellate Procedure 44.2(b) "when the error ha[s] a substantial and injurious effect or influence in determining the jury's verdict"). I would vacate the trial court's judgment and remand the cause for a new trial. I dissent.