**F I L E D**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

06/02/15

**DORIAN E. RAMIREZ, CLERK**
**BY** cholloway

**IN THE COURT OF APPEALS**
**THIRTEENTH SUPREME JUDICIAL DISTRICT**
**CORPUS CHRISTI, TEXAS**

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
6/2/2015 3:51:50 PM
DORIAN E. RAMIREZ
Clerk

**COURT OF APPEALS NO. : 13-14-00733-CR**

**TRIAL COURT CASE NO.: 2013-CRN-001341-D2**

_____

**JUAN JOSE LOPEZ, JR.**
**APPELLANT**

**V.**

**THE STATE OF TEXAS,**
**APPELLEE**

_____

**AMENDED BRIEF OF APPELLANT**

_____

/S/ J. EDUARDO PEÑA
**J. EDUARDO PEÑA**
**1102 Scott Street**
**Laredo, Texas 78040**
**(956) 722-9854**
**(956) 722-9866 (Fax)**
**Bar No. 15737550**
**ATTORNEY FOR APPELLANT**

## IDENTITY OF THE PARTIES AND COUNSEL

**DEFENDANT/APPELLANT:**

Juan Jose Lopez, Jr.
Webb County Jail
Laredo, Texas 78040


Represented by:
Attorney J. Eduardo Peña
1102 Scott Street
Laredo, Texas 78040
(956) 722-9854
(956) 722-9866 (Fax)
State Bar No. 15737550

**APPELLEE:**

THE STATE OF TEXAS

Represented by:
Mr. Isidro R. Alaniz, District Attorney
& Mr. David Reuthinger, Assistant District Attorney
49th Judicial District, Webb County, Texas
Webb County Justice Center, 4Th Floor
Laredo, Texas 78040
(956) 523-4900
(956) 523-5054 (Fax)

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

/S/ J. EDUARDO PEÑA

**J. EDUARDO PEÑA**
**ATTORNEY FOR APPELLANT**

# TABLE OF CONTENTS

**PAGE**

1. IDENTITIES OF THE PARTIES AND COUNSEL.................................. -ii-

2. STATEMENT REGARDING ORAL ARGUMENT................................ -iii-

3. TABLE OF CONTENTS...................................................................... -iv-

4. INDEX OF AUTHORITIES......................................................... -v-, vi

5. STATEMENT OF THE CASE....................................................... 1

6. ISSUES PRESENTED FOR REVIEW....................................... 1-2

**ISSUE NO. 1:** Whether the evidence is legally sufficient to sustain the convictions for murder, aggravated kidnapping, and engaging in organized criminal activity.

**ISSUE NO. 2:** Whether the trial court committed reversible error by refusing the defendant's requested jury instructions which would have included an affirmative submission of the defensive theory of the cause of death of the alleged victim in the jury charge.

**ISSUE NO. 3:** Whether the trial court erred in finding that the appellant did not have standing to complain of the warrantless search of the home where the police found the body of the alleged victim and in thus denying the appellant's motion to suppress evidence.

7. SUMMARY OF THE ARGUMENTS....................................... 2-4

8. STATEMENT OF THE FACTS................................................ 4-12

9. ARGUMENT AND AUTHORITIES....................................... 13-30

10. PRAYER............................................................................... 31

11. CERTIFICATE OF SERVICE............................................... 32

# INDEX OF AUTHORITIES

**CASES**                                               **PAGES**

1.  Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985)……………….20

2.  Brooks v. State, 323 S.W.3d 893 (Tex. Cr. App. 2010)……….2, 13, 14, 15, 20

3.  Casey v. State, 215 S.W.3d 870 (Tex. Crim. App. 2007)………………..30

4.  Druery v. State, 225 S.W.3d 491, 498 (2007)……………….....................20

5.  Evans v. State, 202 S.W. 3d 158 (Tex. Cr. App. 2006)…………………...20

6.  Garcia v. State, 126 S.W.3d 921, 927 & n. 9 (Tex. Crim. App. 2004)……30

7.  Granados vs. State , 85 S.W.3d 217 (Tex. Cr. App. 2002)………………..3, 29

8.  Hill v. State, 585 S.W.3d 713 (Tex. Cr. App. 1979)………………….25, 26, 27

9.  Jackson v. Virgina, …………………………………………………..13

10.  Rojas vs. State, 797 S.W.2d 41 (Tex. Cr. App. 1990)………………4, 29

11.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007)……19, 20, 23,25

12.  Wong Sun v. United States, 371 U.S. 471 (1963)…………………30

## CONSTITUTION OF THE UNITED STATES

Fourth Amendment ……………………………………….....................4, 6, 28, 29

## TEXAS RULES OF APPELLANT PROCEDURE

Rule 44.2(a) …………………………………………………..…….30, 31

Rule 44.2(b) …………………………………………………….......30

**TEXAS PENAL CODE**

Section 7.02(a)(2) …………………………………………………...2

## STATEMENT OF CASE

Appellant, Juan Jose Lopez, Jr. ("Lopez") was indicted on one count of murder, one count of aggravated kidnapping, and count of engaging in organized criminal activity, and one count of tampering with evidence in the 111th Judicial District Court, of Webb County, Texas. (*I C.R. 77-79*) A supplemental clerk's record consists of the defendant's requested jury instructions. (*1 Supp. C.R.*) The case was tried before a jury commencing on October 27, 2014. (*1 R.R.4*) On October 30, 2014, Lopez was found guilty on Counts I, II, and III, which charged him with murder, aggravated kidnapping, and engaging in organized criminal activity, respectively. (*1 C.R. 465-467*). On October 31, 2014, the jury assessed a sentence of 50 years on the murder charge, 17 years on the aggravated kidnapping charge, and 10 years on the engaging in organized criminal activity charge. (*1 C.R. 472-474*) Lopez was sentenced in accordance with the verdict of the jury on October 31, 2014. (*20 R.R. 68-69*) Lopez did not file a motion for new trial; on November 19, 2014, he filed his notice of appeal. *(I C.R. 481)*

## ISSUES PRESENTED FOR REVIEW

**ISSUE NO. 1:** Whether the evidence is legally sufficient to sustain the convictions for murder, aggravated kidnapping, and engaging in organized criminal activity.

**ISSUE NO. 2**: Whether the trial court committed reversible error by refusing the

defendant's requested jury instructions which would have included an affirmative submission of the defensive theory of the cause of death of the alleged victim in the jury charge.

**ISSUE NO. 3:** Whether the trial court erred in finding that the appellant did not have standing to complain of the warrantless search of the home where the police found the body of the alleged victim and in thus denying the appellant's motion to suppress evidence and allowing the State to introduce illegally obtained evidence.

## SUMMARY OF ARGUMENT

***ISSUE NO. 1 :*** *Whether the evidence is legally sufficient to sustain the convictions for murder, aggravated kidnapping, and engaging in organized criminal activity.*

Considering all of the evidence in the light most favorable to the verdict, the jury was not rationally justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893 (Tex. Cr. App. 2010) Specifically, considering all of the evidence in the light most favorable to the verdict, the State failed to prove beyond a reasonable doubt that Appellant caused Vasquez's death, that Appellant kidnapped Vasquez, or that he engaged in organized criminal activity. Further, the State did not present any evidence to show that Appellant acted with intent to promote or assist the commission of the offenses, or that he solicited, encouraged, directed, aided, or attempted to aid another person to commit the offenses. *See §7.02(a)(2) Tex. Penal Code.*

2

*ISSUE NO. 2*: *Whether the trial court committed reversible error by refusing the defendant's requested jury instructions which would have included an affirmative submission of the defensive theory of the cause of death of the alleged victim in the jury charge.*

Appellant was entitled to an affirmative submission of the defensive theory regarding the cause of death, and his properly filed requested jury charge and his objection to the trial court's refusal of the requested jury charge was sufficient to preserve the issue for review. The judgment must be reversed because the issue was raised by the evidence and the trial court erred in refusing the defendant's requested charge on the cause of death of the alleged victim.

*ISSUE NO. 3:* *Whether the trial court erred in finding that the appellant did not have standing to complain of the warrantless search of the home where the police found the body of the alleged victim and in thus denying the appellant's motion to suppress evidence and allowing the State to introduce illegally obtained evidence.*

Appellant established that he had a subjective expectation of privacy in a place which society recognizes as reasonable, namely a home. Therefore, he had a legitimate expectation of privacy in the home which was invaded by police officers. *See Granados vs. State,* 85 S.W.3d 217 (Tex. Cr. App. 2002) Because the police officers entered the home (where the body of the victim was found) without a warrant based on an anonymous telephone call in which a woman claimed that

3

someone had been dragged into a house and was being tortured, and the police did not know whether the caller had personal knowledge of the facts upon which the police relied, or whether the caller was a credible person, the police lacked probable cause to justify a warrantless entry into the home. *See Rojas vs. State*, 797 S.W.2d 41 (Tex. Cr. App. 1990). Since probable cause was lacking, the warrantless entry into the home violated the Fourth Amendment to the United States Constitution, and pursuant to the exclusionary rule, the trial court should have excluded all of the fruits of the warrantless search.

**STATEMENT OF FACTS**

Ana Vasquez ("Ana"), the wife of Ricardo "Ricky" Vasquez ("Vasquez"), the victim of the offenses charged in the indictment, testified that she last saw her husband around 7:30 on the morning of August 29, 2013, when he dropped her off at the school where she was employed as a teacher. (*17 R.R. 27-28, 34*) Ana testified that she was not aware of any problems that existed between her husband and Appellant, Juan Jose Lopez, Jr., ("Lopez"). (*17 R.R. 34*)

Officer Gustavo Sotelo ("Sotelo") testified that on August 29, 2013, around 7:00 p.m., the police received a report of "someone being assaulted" at a house with a brown fence where it was known that drugs were sold in that neighborhood. (*17 R.R. 36-38, 55-56*) The caller did not provide an address but gave a description of the location. (*17 R.R. 57*) When he arrived at the "house where the witness described

4

the male being assaulted", he saw a heavy-set male who walked away as soon as he saw Sotelo. After walking to the rear of the house looking for the heavy-set male and not finding him, Sotelo returned to the front of the house and opened the screen door. (*17 R.R. 39-40*) Sotelo testified that, "At the time the door was opened, and I saw the deceased on the mattress." (*17 R.R. 40, lines 12-14*)

During a voir dire examination by defense counsel, Sotelo testified that at the time that he entered the home at 2920 Napoleon Street rear he entered without a warrant, and that the facts known to him at that time were strictly limited to the information that the Police Department received through the 911 call. (*17 R.R. 42-45*)  When Sotelo entered the home he discovered more evidence which was "in plain view." (*17 R.R. 44-45*) Sotelo further admitted that at the time that the police entered the home they had no way of determining the credibility of the caller, or the reliability of the information that was provided to the Police Department by the anonymous 911 caller. (*17 R.R. 45-46*) A 2x4 board which became a vital piece of evidence for the State was also discovered by the police as a result of the warrantless entry. (*17 R.R. 47*) The heavy-set male who Sotelo saw when he first arrived at the scene of the crime was later identified as Raul Alegria, a co-defendant, who was picked up the following day. (*17 R.R. 52*)

In his trial testimony, Sotelo claimed that when he knocked on the front door "the door opened itself, and that's when [he] observed a body on the mattress." (*17*

5

*R.R. 44, lines 2-4*)

Appellant filed a motion to suppress evidence on the grounds that the police entered the home where the murder was committed without a warrant, without consent, and in the absence of exigent circumstances, and therefore in violation of the Fourth Amendment to the United States Constitution. (*1 C.R. 107-111*) The trial court held a hearing on the sole issue of whether Lopez had standing to complain of the warrantless entry into the premises, and Lopez testified that the owner of the property at 2920 Napoleon Street Rear was Abel Rocha, Sr. ("Rocha, Sr.") (a co-defendant), and that Rocha, Sr. had given him permission to stay there. (*13 R.R. 22-24*) Lopez testified that he used to stay there with the permission of Rocha, Sr., and that he used to sell drugs there. (*13 R.R. 26*)   Rocha, Sr., and the co-defendants in this case also had access to the house. (*13 R.R. 27*) Other friends would enter the house only if Lopez was there, or if Rocha, Sr., gave them permission to go in. (*13 R.R. 28*) The trial court held that Lopez did not have a reasonable expectation of privacy for the purposes of having standing to complain of the Fourth Amendment violation. (*13 R.R. 29*)

Olga Martinez ("Olga"), the sister of Candelario Hernandez ("Hernandez"), a co-defendant in the case, testified that on August 29, 2013, she dropped off Hernandez at the house located at 2920 Napoleon Street, where the crimes in question occurred, between 12:00 p.m. and 1:00 p.m. (*17 R.R. 116-117*) Olga was

6

aware Hernandez was a drug user. (*17 R.R. 119-120*)

Edward Flores, a detective for the Laredo Police Department testified that a missing persons report was filed on August 8, 2013, regarding an individual named Abelardo Rocha, III ("Abelardo"), and another individual named Carlos Edmund Gamboa ("Carlos"). (*17 R.R. 206*) Abelardo and Carlos were last seen on August 7, 2013, after they were dropped off at the International Bridge and they walked across the bridge into Mexico to collect some money. (*17 R.R. 207, 210*)

Raul Alegria ("Alegria"), a co-defendant in this case, told Richard Reyes, Jr., a detective, ("Det.. Reyes"), that the motive for the murder was extortion. (*17 R.R. 214*) According to Alegria, Abel Rocha, Sr. ("Rocha, Sr."), another co-defendant, blamed Vasquez for extorting money and a vehicle from the Rocha family to return or attempt to return Abelardo. (*17 R.R. 214-217*) Abelardo is the nephew of Rocha, Sr., who posted bail and absconded, possibly to Mexico. (*17 R.R. 214, 217*)

Alegria further told Det. Reyes that Rocha, Sr., directed a group of men to torture and kill Vasquez, and that he "brandished a buck knife and slashed the victim's throat and cut off a portion of his ear". (*17 R.R. 215, lines 13-14*) Alegria told Det. Reyes that while Vasquez was being tortured, Rocha, Sr., stated, "This is probably what they're doing to my nephew in Mexico, right now." (*17 R.R. 215, lines 19-20*) The State did not present testimony from either Alegria or any other co-defendant to show that Lopez was among the group of men who Rocha, Sr.,

7

directed to torture and kill Vasquez.

According to Det. Reyes, the investigation revealed that there were 6 suspects in the case besides Alegria: Juan Jose Lopez, Jr., Appellant herein, Roberto Sanchez, Candelario Hernandez, Abel Rocha, Sr., Abel Rocha, Jr., and Sergio Garcia. (*17 R.R. 214*) Alegria and the other 6 suspects in the case were all indicted for the kidnapping and murder of Ricardo Vasquez. (*1 C.R. 77-80*)

Dr. Ray Fernandez ("Dr. Fernandez"), the Nueces County Medical Examiner who performed an autopsy on the body of the victim, testified that he found blunt force trauma, multiple abrasions, lacerations, and contusions on different parts of the body. (*17 R.R. 130, 143*) The body also exhibited stab wounds and incise wounds. (*17 R.R. 144*) The autopsy further revealed a slash wound around the left side of the neck, and a slash wound around the right side of the neck, and a slice of the left ear. (*17 R.R. 144*) Dr. Fernandez also found hemorrhage under the scalp, indicating that Vasquez was hit on that area of his body, and a fracture of the skull beneath an injury to the upper forehead. (*17 R.R. 145*) These injuries are consistent with blunt force trauma. (*17 R.R. 145*) Vasquez also sustained three fractures along the ribcage consistent with blunt force trauma with blood in the surrounding tissues, which indicates that "the person is still alive, the heart is still beating, and you fracture the rib and it causes bleeding around that structure." (*17 R.R. 146, lines 9-12*)

In response to a question by defense counsel as to whether "the blunt force

8

injury [would] have caused the death of Ricardo Vasquez independently of the sharp force injury", Dr. Fernandez stated: "The blunt force trauma caused bruising on the brain. It was part of the sharp force trauma. It did not – it didn't cause a significant amount of bleeding on the brain. So, probably the blunt force trauma by itself would not cause the death." (*17 R.R. 154, lines 19-23*) According to Dr. Fernandez, the laceration to Vasquez's neck, which the State alleged was inflicted by Rocha, Sr., "cut through the two major veins there, the jugular veins." (*1 C.R. 78, 79*) (*17 R.R. 155, lines 6-7; 215*)

Detective David Carmona ("Det. Carmona"), testified that the police believed that the 2x4 "might have been the possible weapon used in the death of the victim". (*18 R.R. 60-61, 64*) Det. Carmona saw the injuries sustained by Vasquez and testified that Vasquez had "deep lacerations to the neck", but the police did not recover the weapon that might have been used to inflict such injuries. (*18 R.R. 64-65*) Det. Carmona interviewed Lopez on August 30, 2013, and testified that when he questioned Lopez about Vasquez's murder Lopez stated that he had heard what had happened, but denied knowing who the victim was. (*18 R.R. 106-107*) Lopez also admitted that he had seen Roberto Sanchez ("Sanchez"), Candelario Hernandez ("Hernandez"), and Alegria (co-defendants) on the date of the murder, at the house where the murder occurred, between the hours of 10:00 A.M. and 2:00 P.M. (*18 R.R. 108-110*) Lopez claimed that he hadn't seen Vasquez "in a while". (*18*

9

*R.R. 111*)

Det. Carmona further testified that he interviewed Hernandez, and that Hernandez stated that the victim had gotten loose and he "went after him with a 2x4 and started striking him, and in turn he took the 2x4 away from him and hit him back in self-defense. (*18 R.R. 116-117*)

Under cross-examination, Det. Carmona admitted that police officers discovered the body of the deceased upon *opening* the door, and also discovered other items of evidence as a result of a warrantless entry into the home, including the 2x4 board which the State alleged Lopez used to strike Vasquez thus causing his death. (*18 R.R. 119-120*) Det. Carmona said that the person who made the anonymous 911 call that led to the discovery of the victim's body was afraid of her identity being disclosed because she feared for her life. (*18 R.R. 125*)

Kimberly Lander ("Lander"), a forensic scientist with the Bexar County Criminal Investigation Laboratory, testified that swabs of a blood-stained 2x4 board recovered from the scene of the crime showed that neither Lopez nor Vasquez could be excluded as contributors of a DNA sample obtained from the board. (*18 R.R. 170-174*) Hernandez, also could not be excluded as a donor of a mixture of DNA recovered from an area of the 2x4 that a person would hold if he swung the board like a bat. (*18 R.R. 169, 172-173, 211*) A cutting from Lopez's t-shirt and a cutting from his shorts tested positive for the possible presence of blood, and DNA

10

comparison testing showed that Vasquez "was not excluded as a contributor of the DNA on both the cutting from the orange T-shirt and the cutting from the shorts". (*18 R.R. 180-183, 190-193*) Further, according to Lander, Vasquez was not excluded as a contributor of DNA from a swab of Lopez's Nike shoes. (*18 R.R. 194-195*) Vasquez could not be excluded as a donor of DNA obtained from a swab of Sanchez's Adidas shoes, or from a cutting of the shoe laces of Hernandez's shoes. (*18 R.R. 184-185, 187-188*)

Under cross-examination Lander stated that Lopez's orange T-shirt had "small stains" which tested positive for the possible presence of blood (*18 R.R. 180-181, 200*) Lopez's shorts also had "blood droplets" and "reddish-brown soiling to the entrance of the pocket." (*18 R.R. 201*) Landers clarified that she did not have the ability to determine from her examination of the stains on Lopez's clothes whether he was a bystander or a participant in the murder. (*18 R.R. 202*)

Defense counsel asked Lander: "You were talking about the combined probability index, and you mentioned with regards to swab number 2, from the 2x4 board, if you randomly select 36 people from the population, one of those would have the same genetic profile as Juan Jose Lopez and could not be excluded as the source of the DNA in that item, correct?" (*18 R.R. 202-203*)

Landers responded, "[I]t's partly correct, but partly incorrect…The CPI, what that indicates is that there's a mixture of DNA, not a single source…The CPI

11

number indicates that, were I to have 36 people, and if I were to test all of them, I would expect, based on the frequency of alleles and the evidence, the DNA markers observed on the same evidence, not that the same person is the same profile as Juan Jose Lopez or Ricardo Vasquez or Candelario Hernandez, but their markers are part of what I'm seeing." (*18 R.R. 203*)

Landers agreed that "touch DNA" can be transferred from one item to another during the process of collecting evidence at the scene of the crime if the correct procedure is not followed. (*18 R.R. 206*) Landers could not determine the time when the DNA was deposited on the 2x4. (*18 R.R. 206*) Landers agreed that the DNA sample that she obtained from the 2x4 board was "a mixed sample of DNA [which] may contain background DNA, crime-related DNA, or after-the-crime contamination". (*18 R.R. 210*)

Tammi Sligh ("Sligh"), a forensic scientist with the Bexar County Crime Lab testified that she did a comparative analysis of footprint impressions which is a subdiscipline of tool marks and firearms identification. (*19 R.R. 36*) Sligh's opinion was that a red Nike shoe which was identified as belonging to Lopez made a footwear impression that was in a photograph of the crime scene. (*18 R.R. 32*; *19 R.R. 51-52*)

Lopez elected not to testify at his trial.

## ARGUMENT AND AUTHORITIES

***ISSUE NO. 1*** *: Whether the evidence is legally sufficient to sustain the convictions for murder, aggravated kidnapping, and engaging in organized criminal activity.*

In <u>Brooks v. State</u>, 323 S.W.3d 893 (2010), the Court of Criminal Appeals did away with factual sufficiency review announcing that "the <u>Jackson v. Virgina</u>, legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." In the instant case, the State alleged in Count I of the indictment that "*Raul Alegria, Abel Rocha Jr., Juan Jose Lopez Jr., Roberto Sanchez, Jr., Candelario Hernandez Jr., Sergio Garcia-Garza and Abel Rocha did then and there intentionally cause the death of an individual, namely Ricardo Vasquez, by striking him with a blunt object causing blunt trauma to his body, and/or head, and/or face, and/or by causing a laceration to his neck.*" (*1 C.R. 77*) Count III, which charged all of the defendants with the offense of engaging in organized criminal activity, alleged as overt acts that: "*On or about August 29, 2013, Juan Jose Lopez struck Ricardo Vasquez at 2920 Napoleon Street…On or about August 29, 2013, Abel Rocha cut Ricardo Vasquez's throat and stabbed Ricardo Vasquez's throat at 2920 Napoleon Street.*". (*1 C.R. 78, 79*) Therefore, the State's theory of the case was clearly that Abel Rocha intentionally or knowingly cut and stabbed Vasquez in the throat, and that Lopez intentionally or

13

knowingly struck Vasquez with the 2x4 board, and that the beating with the 2x4 board, and/or the cuts and stab wounds to Vasquez's neck, caused his death. The State also alleged in the indictment that "*On or about August 13, 2013, Candelario Hernandez struck Ricardo Vasquez at 2920 Napoleon Street…*". (*1 C.R. 78, 79*) The alleged role of each of the other co-defendants in the murder and kidnapping of Ricardo Vasquez was described in the overt acts of Count III in the indictment. (*1 C.R. 78-79*) Therefore, under the <u>*Brooks*</u> standard of legal sufficiency review, the appellate court must determine "whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." <u>*Brooks v. State*</u>, 323 S.W.3d 893 (2010). To make this determination, the reviewing court must inquire whether "[c]onsidering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." <u>*Id*</u>. More specifically, the question is whether the evidence is sufficient to support the implied jury finding that Juan Jose Lopez, Jr., caused the death of Ricardo Vasquez by striking him with a blunt object as alleged in the indictment and by the State during the trial. (*1 C.R. 77*; *17 R.R. 24; 19 R.R. 113*) In the State's opening statement, the prosecution told the jury: "The evidence will show you, at the end of it all, that Juan Jose Lopez is guilty beyond a reasonable doubt of what we've read on the indictment." (*17 R.R. 24, lines 3-6*) In closing arguments the State argued: "All of that evidence has to be placed together so that you can make the

14

reasonable inference that Juan Jose Lopez, as a party, struck and murdered Ricardo Vasquez." (*19 R.R. 113, lines 3-6*) The "Charge Of The Court" included an instruction on "Law Of Parties", but the State did not present any evidence at all to show that Lopez either solicited, encouraged, directed, aided, or attempted to aid another person to commit the offense. (*1 C.R. 451*) Therefore, to convict Lopez of murder, the jury had to find beyond a reasonable doubt that Lopez caused the death of Ricardo Vasquez by striking him with the 2x4 board. (*1 C.R. 77*; *17 R.R. 24; 19 R.R. 113*) To make this determination, the reviewing court must inquire whether considering all of the evidence in the light most favorable to the verdict, was the jury rationally justified in finding beyond a reasonable doubt that Lopez caused the death of Ricardo Vasquez by striking him with a 2x4 board. *Brooks v. State*, 323 S.W.3d 893 (2010)

The evidence linking Lopez to the murder and kidnapping of Ricardo Vasquez consisted of:

1. Statements made by Alegria and Garcia to Det. Reyes from which he concluded that Lopez, along with Roberto Sanchez, Candelario Hernandez, Abel Rocha, Sr., Abel Rocha, Jr., Raul Alegria, and Sergio Garcia were suspects in the case. (*17 R.R. 213-214*)

2. Lander's expert witness testimony that swabs of a blood-stained 2x4 board recovered from the scene of the crimes showed that neither Lopez nor

15

Vasquez could be excluded as contributors of a DNA sample. (*18 R.R. 170-174*)

3. Lander's expert witness testimony that DNA comparison testing showed that Vasquez "was not excluded as a contributor of the DNA on both the cutting from the orange T-shirt and the cutting from the shorts", or from a swab of Lopez's left Nike shoe. (*18 R.R. 180-183, 190-195*)

4. Sligh's expert witness's opinion that a red Nike shoe which was identified as belonging to Lopez made a footwear impression that was in a photograph of the crime scene. (*18 R.R. 32*; *19 R.R. 51-52*)

5. Lopez's statement to police investigators that he had heard what had happened, but did not know who the victim was. (*18 R.R. 106-107*)

A review of the evidence, in the light most favorable to the verdict, will show that the jury was not rationally justified in finding beyond a reasonable doubt that Lopez caused the death of Ricardo Vasquez, that he participated in the kidnapping of Vasquez, or that he engaged in organized criminal activity.

Although Det. Reyes testified that he interviewed Alegria and Garcia, and that the investigation revealed that Lopez and the other co-defendants were suspects in the case, the State did not present testimony from Alegria, from Garcia, or from any other co-defendant, to show that Lopez participated in striking Vasquez with the board.

16

Det. Carmona, testified that he interviewed Hernandez, and that Hernandez stated that the victim had gotten loose and he "went after him with a 2x4 and started striking him, and in turn he took the 2x4 away from him and hit him back in self-defense." (*18 R.R. 116-117*) Thus, the State's own evidence showed that a co-defendant confessed to striking Vasquez with the 2x4 board which the State alleged was one of the murder weapons used to kill Vasquez. (*18 R.R. 60-61, 64, 116-177*) If there was no evidence that another individual struck Vasquez with the board, certainly it would be more logical to infer that Lopez struck Vasquez with the board, based on Lander's testimony that Lopez could not be excluded as being a donor of the mixture of DNA obtained from the board. But this is not a case where there is no other suspect who could have committed the crime that the defendant is charged with; there were six other co-defendants in the case, and one who actually confessed to having struck the victim with the 2x4 board in question. (*18 R.R. 60-61, 64, 116-177*)

The testimony from the State's expert witness, Kimberly Lander ("Lander"), a forensic scientist with the Bexar County Criminal Investigation Laboratory, was that swabs of the blood-stained 2x4 board recovered from the scene of the crime showed that neither Lopez nor Vasquez could be excluded as contributors of a DNA sample obtained from the 2x4 board. (*18 R.R. 170-174*) But consistent with his own admission that he struck Vasquez with the 2x4 board, Hernandez, also could not be

17

excluded as a donor of a mixture of DNA recovered from an area of the 2x4 that a person would hold if he swung the board like a bat. (*18 R.R. 169, 172-173, 211*) Under cross-examination, Lander clarified that she did not mean that the DNA sample which was obtained from a swab of the 2x4 board matched the genetic profile of Lopez, but rather that the "mixture of DNA" contained genetic markers which matched Lopez's genetic markers, and which would match the genetic markers of 1 out of every 36 people randomly selected from the population. (*18 R.R. 202-203*)

Lander also agreed that "touch DNA" can be transferred from one item to another during the process of collecting evidence at the scene of the crime if the correct procedure is not followed. (*18 R.R. 206*)

Further, Lander could not determine the time when the DNA was deposited on the 2x4. (*18 R.R. 206*)

Lander also agreed that the DNA sample that was obtained from the 2x4 board was "a mixed sample of DNA [which] may contain background DNA, crime-related DNA, or after-the-crime contamination". (*18 R.R. 210*) Thus, the DNA evidence presented by the State is inconclusive with regard to whether Lopez directly deposited his touch DNA on the 2x4 board during the commission of the crime, before the commission of the crime, or after the commission of the crime.

Lander's testimony that Lopez's touch DNA could also have been transferred

from another object to the 2x4 board rendered such forensic evidence even more inconclusive with regard to the question of whether Lopez actually handled the 2x4 board, especially considering the testimony of Officer J. R. Cantu, a crime scene investigator who collected evidence at the scene of the crime, who testified that it's important to change gloves often to prevent DNA from being transferred from one object to another while collecting evidence, but that he did not recall how often he or the other officer who collected evidence at the scene of the crime changed gloves to avoid contamination. (*17 R.R. 112-113; 18 R.R. 206, 210*)

The small reddish-brown stains on Lopez's T-shirt, shorts, and left Nike shoe which tested positive for the presence of blood, and which yielded DNA samples from which Vasquez could not be excluded as a contributor, together with the footwear impression testimony, shows only that Lopez was present during, or shortly after, the commission of the crimes, but does not support the conclusion that he struck Vasquez with the 2x4 board. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007)   In fact, Lopez's presence during, or shortly after, the commission of the murder is practically indisputable in light of Lander's testimony that DNA comparison testing showed that Vasquez could not be excluded as the contributor of the DNA obtained from the small blood stains on Lopez's T-shirt, shorts, and Nike shoes, and in light of Sligh's testimony that a red Nike shoe which was identified as belonging to Lopez made a footwear impression that was in a photograph of the

19

crime scene. (*18 R.R. 32, 180-183, 190-193; 19 R.R. 51-52*) But, mere presence at the scene of a crime is not sufficient to render a person an accomplice. <u>*Druery v. State*</u>, 225 S.W.3d 491, 498 (2007)

As the Court noted in <u>*Evans v. State,*</u> 202 S.W. 3d 158 (Tex. Cr. App. 2006), "where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. (*quoting from* <u>*Anderson v. City of Bessemer*</u>, 470 U.S. 564, 574 (1985). Appellant acknowledges that in reviewing the legal sufficiency of the evidence, an appellate court must not re-evaluate the weight or credibility of the evidence on the record, or substitute the court's judgment for that of the jury. <u>*Williams v. State*</u>, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007) On the other hand, however, the appellate courts must ensure that the evidence supports a conclusion that the defendant committed the crime charged in the indictment. <u>*Id.*</u> The problem here is that the circumstantial evidence presented by the State does *not* support the conclusion that Lopez struck Vasquez with the 2x4 board, especially in light of Hernandez's confession that *he* struck Vasquez with the 2x4 board, and in light of Lander's testimony that DNA testing showed that Hernandez could not be excluded as a contributor of the DNA sample obtained from the board. (*18 R.R. 116-117, 169, 172-173, 211*); <u>*Brooks v. State*</u>, 323 S.W.3d 893 (2010) (*18 R.R. 202-203*)

But more importantly, Lander testified that the DNA obtained from the 2x4

20

board was a mixed sample and that 1 out of every 36 people randomly selected from the population, if tested, would have the same genetic markers that she found in the mixed DNA sample. (*18 R.R. 202-203*) The statistical number, Lander explained, is for the purpose of giving the trier-of-fact information that allows them "to assess how much weight should be given to the evidence." (*18 R.R. 189*) On a "single-source profile" the forensic scientist assigns a statistical number referred to as "the random match probability" which reflects the probability of finding a certain DNA profile in a random population of unrelated individuals. (*18 R.R. 190*) As Lander explained, the forensic scientist is looking for a genetic profile "that is very rare, and that's so that it allows us to say that you wouldn't expect many people in the population to have this profile." (*18 R.R. 190*) Where there is a mixture of DNA, as on the 2x4 board, the forensic scientist is unable to distinguish one contributor from another, and uses a statistical number called "the combined probability of inclusion" to measure "how many people in the population, at random if chosen, would also not be excluded from the mixture of DNA profiles." (*18 R.R. 190*) For the blood stains found on Lopez's T-shirt for example, Lander testified that Vasquez was not excluded as a donor of DNA and that the combined probability of inclusion was "once in every 599 billion 900 million individuals." Thus, based on Lander's explanation of the purpose of assigning a statistical number to the results of DNA comparison testing, it would be extremely unlikely that the DNA did not belong to

21

Vasquez, and this evidence was entitled to great weight. (*18 R.R. 189-190*) With regard to the DNA comparison testing of Lopez's shorts and left Nike shoe, which did not exclude Vasquez as a contributor, the random match probability was "one in every one quadrillion 219 trillion people." (*18 R.R. 194*)

However, the combined probability of inclusion for the results of DNA testing on the 2x4 board, from which Lopez could not be excluded as a donor, **was only 1 in 36.** (*18 R.R.191-192, 202-203*) Applying Lander's explanation of the purpose of assigning a statistical number to the results of DNA comparison testing, this evidence should have been afforded little to no weight. (*18 R.R. 189-190,202-203*) In fact, under re-direct examination Lander responded to a question regarding the statistic of "1 out of 36" as follows: "So, the statistic is, you know, not very strong in comparison to the other stats." (*18 R.R. 212-213, lines 5-6*) This low statistical value (1 out of 36) is of vital importance in reviewing the legal sufficiency of the evidence, because the expert witness testimony to the effect that Lopez could not be excluded as a donor of a sample of DNA obtained from one of the two alleged murder weapons, the 2x4 board, was the single piece of evidence from which the jury could conceivably make a rational finding that Lopez caused the death of Ricardo Vasquez by striking him with a blunt instrument as alleged in the indictment. (*1 C.R. 77-79*) (*18 R.R. 170-174*)   The remainder of the evidence does nothing more than to show Lopez's presence at the scene of the crime. (*17 R.R. 213-214; 18 R.R. 32, 180-183,*

22

*190-195; 19 R.R. 51-52*)

The difference between a combined probability of inclusion of "once in every 599 billion 900 million individuals" and the combined probability of inclusion of 1 in 36 is so vast as to render the latter testimony as having little or no weight at all. (*18 R.R. 189-190, 194-195, 202-203*) The disparity in the weight to be given the evidence by the jury is even greater if we compare the random match probability of exclusion of "one in every one quadrillion 219 trillion people" to the combined probability of inclusion of 1in 36. (*18 R.R. 194*)

One can only conclude that in making an implied finding that Lopez caused the death of Ricardo Vasquez by striking him with a 2x4 board, the jury either did not understand Lander's testimony, or completely ignored it in rendering their verdict of guilty. Considering such a huge disparity in the weight of the evidence assigned by the State's expert witness to the DNA comparison testing of Lopez's T-shirt, his shorts, and his left Nike shoe, on the one hand, and the weight of the evidence assigned by the State's expert witness to the DNA comparison testing of the sample obtained from the 2x4 board, on the other hand, it cannot be said that any rational fact-finder could have found beyond a reasonable doubt that Lopez caused the death of Vasquez by striking him with a blunt instrument. <u>*Williams v. State*</u>, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007)

From the dubious conclusion that it was indeed Lopez's DNA on the 2x4

23

board, the jury had to make another big leap in logic to reach the conclusion that Lopez struck Vasquez with the 2x4 board as alleged by the State. (*1 C.R. 78*) Assuming arguendo that the State proved beyond a reasonable doubt that Lopez's DNA was on the 2x4 board, in the context of all of the evidence presented by the State, it is more probable that Lopez did not strike Vasquez with the board. The evidence showed that Abel Rocha, Sr., had a motive to kidnap and murder Vasquez, but there was absolutely no evidence that Lopez had a motive to beat or kill Vasquez. (*17 R.R. 206-217*) The evidence further showed that Hernandez confessed to striking Vasquez with the 2x4 board to Det. Carmona and did not claim that Lopez also struck him. (*18 R.R. 116-117*) The blood stains on Lopez's T-shirt and shorts were described by Lander as "small reddish-brown stains", and she was unable to say whether Lopez was a participant or a bystander. (*18 R.R. 200-202*)

Then, having reached the irrational conclusion that Lopez beat Vasquez with the 2x4 board (based on the low probability that Lopez's DNA was on the 2x4 board and on the assumption that his DNA was directly deposited by Lopez on the board during the commission of the crimes, rather than before or after) the jury had to make another inference which is contrary to the evidence: that Lopez caused the death of Vasquez by striking him with the board. (*17 R.R. 154, lines 19-23*) This implied finding of fact by the jury disregards Dr. Fernandez's testimony that "probably the blunt force trauma by itself would not cause the death", and that the

24

laceration to Vasquez's neck, which the State alleged was inflicted by Rocha, Sr., "cut through the two major veins there, the jugular veins." (*1 C.R. 78, 79*) (*17 R.R. 154, lines 19-23, 155, lines 6-7; 215*) Although an appellate court must not re-evaluate the weight or credibility of the evidence on the record, or substitute the court's judgment for that of the jury, an appellate court must ensure that the evidence supports a conclusion that the defendant committed the crimes charged in the indictment. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007) In the instant case, looking at all of the evidence presented as a whole, it cannot be said that the evidence supports the conclusion that Juan Jose Lopez, Jr., caused the death of Ricardo Vasquez, by striking him with a blunt instrument. *Id.*

***ISSUE NO. 2: Whether the trial court committed reversible error by refusing the defendant's requested jury instructions which would have included an affirmative submission of the defensive theory of the cause of death of the alleged victim in the jury charge.***

In a criminal trial, a defendant is entitled to an affirmative submission of every defensive theory raised by the evidence, and this rule applies equally to defensive theories regarding the cause of death in murder trials. *Hill v. State*, 585 S.W.3d 713 (Tex. Cr. App. 1979) The evidence in this case clearly raised the defensive issue that Vasquez's death resulted from a cause other than that alleged against Lopez in the indictment. Specifically, Dr. Fernandez testified that: "The

25

blunt force trauma caused bruising on the brain. It was part of the sharp force trauma. It did not – it didn't cause a significant amount of bleeding on the brain. So, probably the blunt force trauma by itself would not cause the death." (*17 R.R. 154, lines 19-23*) This testimony of the medical examiner was in response to a question by defense counsel as to whether "the blunt force injury [would] have caused the death of Ricardo Vasquez independently of the sharp force injury". (*17 R.R. 154*) According to Dr. Fernandez, the laceration to Vasquez's neck, which the State alleged was inflicted by Rocha, Sr., "cut through the two major veins there, the jugular veins." (*1 C.R. 78, 79*) (*17 R.R. 155, lines 6-7; 215*) Counsel for Lopez also argued in closing that the evidence showed that the cause of death was the deep laceration to Vasquez's neck which was inflicted by Abel Rocha, Sr. (*19 R.R. 129-132*)

Further, Lopez timely presented his request for a charge on the issue of cause of death, and his request was refused and denied by the trial court. (*1 Supp. C.R. 93-97*)(*19 R.R. 17-19*)   Lopez objected to the trial court's denial of his request for an instruction on cause of death. (*19 R.R. 19-20*) Thus the issue was properly preserved for appellate review. <u>Hill v. State</u>, 585 S.W.3d 713 (Tex. Cr. App. 1979)

In <u>Hill</u>, *supra,* the Court stated that "appellant would have been entitled to even more specificity in the defensive charge, in that the law should have been

26

applied to the facts of the case as raised by the defensive evidence on the cause of death." <u>Hill v. State</u>, 585 S.W.3d 713 (Tex. Cr. App. 1979) In the instant case, Appellant's requested jury instruction on cause of death provided in pertinent part: "Therefore, if you find from the evidence, that Abel Rocha caused the death of Ricardo Vasquez by causing a deep laceration to his neck with a sharp instrument, you shall acquit Juan Jose Lopez, Jr., of the charge of murder as alleged in Count I of the indictment." (*1 Supp. C.R. 96-97*)

Lopez was entitled to an affirmative submission of the defensive theory regarding the cause of death, and his timely filed requested jury charge was sufficient to preserve the issue for review. The trial court erred in refusing Lopez's requested charge on cause of death and accordingly the judgment must be reversed and remanded for a new trial with appropriate instructions to the trial court. <u>Hill v. State</u>, 585 S.W.3d 713 (Tex. Cr. App. 1979)

***<u>ISSUE NO. 3</u>: Whether the trial court erred in finding that the appellant did not have standing to complain of the warrantless search of the home where the police found the body of the alleged victim and in thus denying the appellant's motion to suppress evidence and allowing the State to introduce illegally obtained evidence.***

Appellant filed a motion to suppress evidence on the grounds that the police entered the home where the murder was committed without a warrant, without consent, and in the absence of exigent circumstances, and therefore in violation of

27

the Fourth Amendment to the United States Constitution. (*1 C.R. 107-11*) The trial court held a hearing on the sole issue of whether Lopez had standing to complain of the warrantless entry into the premises, and Lopez testified that the owner of the property at 2920 Napoleon Street Rear was Abel Rocha, Sr. ("Rocha, Sr.") (a co-defendant), and that Rocha had given him permission to stay there. (*13 R.R. 22-24*) Lopez testified that he used to stay there with the permission of Rocha, Sr., and that he used to sell drugs there. (*13 R.R. 26*) Rocha, Sr., and the co-defendants in this case also had access to the house. (*13 R.R. 27*) Other friends would enter the house only if Lopez was there, or if Rocha, Sr., gave them permission to go in. (*13 R.R. 28*) The trial court held that Lopez did not have a reasonable expectation of privacy for the purposes of having standing to complain of the Fourth Amendment violation. (*13 R.R. 29*)

Lopez also filed "Defendant's Offer Of Proof On Motion To Suppress Evidence", since the trial court limited the hearing on the motion to suppress to testimony regarding the issue of whether Lopez had standing to complain of the alleged Fourth Amendment violation. (*1 C.R. 332-337*) The Court admitted the Defendant's offer of proof with the pertinent parts of the "Complaint" for a warrant that was sworn to by Det. Carmona. (*14 R.R. 7-13*) The sworn complaint states that on August 29, 2013, an emergency call was made by an anonymous caller who claimed that "a male subject was being tortured and dragged inside a small wooden

28

house with a wooden fence … by the 1300 Block of S. Canada next to an abandoned demolished home", where drugs were sold and where police had conducted raids in the past. (*1 C.R. 335*) Det. Carmona's sworn complaint continued stating, "Given the details provided by the caller and the urgent nature of the call, Officer Sotelo with the assistance from Officer Jose M. Ugarte and Officer Agapito Perez made their way into the residence with the wooden fence, upon which they observed a male subject bound and gagged possibly deceased." (*1 C.R. 335-336*)

Appellant's testimony was not contradicted or impeached, and therefore he established that he had a subjective expectation of privacy in a place which society recognizes as reasonable, namely a home. (*13 R.R. 13-29*)   Accordingly, Lopez had a legitimate expectation of privacy in the home which was invaded by police officers. *See Granados vs. State*, 85 S.W.3d 217 (Tex. Cr. App. 2002) Because the police officers entered the home (where the body of the victim was found) without a warrant based on an anonymous telephone call in which a woman claimed that someone had been dragged into a house and was being tortured, and the police did not know whether the caller had personal knowledge of the facts upon which the police relied, or whether the caller was a credible person, the police lacked probable cause to justify a warrantless entry into the home. *See Rojas vs. State*, 797 S.W.2d 41 (Tex. Cr. App. 1990).   Since probable cause was lacking, the warrantless entry into the home violated the Fourth Amendment to the United States Constitution, and

29

pursuant to the exclusionary rule, the trial court should have excluded all of the fruits of the warrantless search. *Wong Sun v. United States*, 371 U.S. 471 (1963)

Pursuant to Rule 44.2(a), Tex. R. App. P., "if the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Error that does not constitute constitutional error is reviewed under Rule 44.2(b), which provides that: "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Under Rule 44.2(b), an appellate court may not reverse for non-constitutional error if, after examining the record as a whole, the court has a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey v. State,* 215 S.W.3d 870 (Tex. Crim. App. 2007), citing *Garcia v. State,* 126 S.W.3d 921, 927 & n. 9 (Tex. Crim. App. 2004)

After examining the record as a whole, the court cannot have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey v. State,* 215 S.W.3d 870 (Tex. Crim. App. 2007), citing *Garcia v. State,* 126 S.W.3d 921, 927 & n. 9 (Tex. Crim. App. 2004) Therefore, pursuant to Rule 42.2(a), Tex. R. App. P., the conviction and the sentence must be reversed.

30

## PRAYER

Wherefore, Appellant prays that the judgment of conviction and sentences imposed by the trial court be reversed and that a judgment of acquittal be rendered, or in the alternative, that the cause be remanded for a new trial.

Respectfully submitted

/s/ J. EDUARDO PEÑA
**J. EDUARDO PEÑA**
1102 Scott Street
Laredo, Texas 78040
(956) 722-9854
(956) 722-9866 (Fax)
jpena84@att.net
Bar No. 15737550
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellant's Amended Brief was served on Mr. Isidro R. Alaniz, District Attorney, 49th Judicial District, Webb County, Texas, via the electronic filing system at iralaniz@webbcountytx.gov, and on Mr. David Reuthinger, at dreuthinger@webbcountytx.gov, Assistant District Attorney, on the 2nd day of June, 2015.

/S/ J. EDUARDO PEÑA

**J. EDUARDO PEÑA**
Attorney for Appellant

# CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4(i)(3), the undersigned attorney for Appellant, certifies this computer-generated appellant's brief contains 8,449 words and that it complies with the word limits of Tex. R. App. P. 9.4(i)(2)(B).

1. Exclusive of the portions excluded by Tex. R. App. P. 9.4(i)(1), the Amended Appellant's Brief contains 8,449 words.

/S/ J. EDUARDO PEÑA
**J. EDUARDO PEÑA**
**ATTORNEY FOR APPELLANT**