

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00475-CR

———————————————————

QWENTON NARVELL BADGER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1496031D

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Qwenton Narvell Badger appeals his conviction for the murder of Demione Hicks. *See* Tex. Penal Code Ann. § 19.02(b), (c). After the jury found Badger guilty, he pleaded true to an enhancement, and the trial court sentenced him to thirty-five years' confinement. In two points, Badger argues that the evidence is insufficient to support his conviction and that the trial court abused its discretion by denying his motion for mistrial that was premised on having an allegedly biased juror on the jury panel. Because some of the witnesses' testimonies and forensic evidence connected Badger to Hicks's murder, we hold that the evidence is sufficient to support Badger's conviction. And because the record reflects that defense counsel did not ask any questions calculated to bring out information that might have indicated the complained-of juror's inability to be impartial and truthful, we hold that the trial court did not abuse its discretion by denying Badger's motion for mistrial. However, because the judgment reflects that the jury, rather than the trial court assessed Badger's punishment, we modify the judgment to correct that inaccuracy and affirm the judgment as modified.

## II. Factual Background

### A. Hicks's Problems with a Coworker

Vanessa Valle, who was Hicks's girlfriend for over fifteen years, testified that in April 2017, a temporary job service had placed Hicks with a beverage distribution

2

company located in southwest Fort Worth. Hicks worked from 4 p.m. until whenever the job was finished—sometimes around 3:00 a.m.—and usually came home around 10:15 p.m. to eat his "lunch."

When Hicks came home for his lunch on April 18, 2017, he told Valle that he was upset with a guy from work. Valle was fearful for Hicks and told him not to go back to work. Hicks said that he had to take care of his family, kissed Valle on the forehead, and returned to work.

### B.  Badger and Hicks Exited the Parking Lot at the Same Time

The daily log of vehicles from the guard shack at the Ben E. Keith beverage distribution center reflected that Badger, with license plate HRZ ####, entered at 10:07 p.m. on April 18 and left at 1:10 a.m. on April 19. Hicks also left at 1:10 a.m. on April 19.

### C.  The Shooting

Eric Wisdom, who worked on Will Rogers Boulevard near the Ben E. Keith beverage distribution center, testified that he was sitting in his vehicle during a work break on the night in question and noticed a dark-colored vehicle sitting on Will Rogers Boulevard with its headlights on. Wisdom then heard a gunshot followed approximately ten seconds later by a second gunshot. After the second gunshot, Wisdom saw another set of headlights on a light-colored vehicle, which came from behind the stationary vehicle and sped past him, and he called 911.

On cross-examination, Wisdom testified that he was absolutely certain that the vehicle that sped away was not black or red. Wisdom believed that the person in the light-colored car had fired the shots. Wisdom wrote out a statement at the scene and gave it to the police. He was not contacted by the police after that date.

Ida Barnes testified that her nephew Deaundre Mitchell worked at the Ben E. Keith distribution center and that she drove him to and from work. She recalled that after she had picked up Mitchell on the night in question, she saw what she initially thought was a wreck. As Barnes slowed to fifteen or twenty miles per hour, she saw that there had not been a wreck because there was no damage to either car; instead, two men were standing outside their vehicles and appeared to be arguing. Barnes said that a short black man[1] was near a maroon car, which was shaped like a Mercury or a Taurus and which was parked behind a black car that had a tall black man[2] near it.

"[N]ot even two minutes" after Barnes had driven less than two blocks past the two cars, she heard a single gunshot and slowed down. In her rearview mirror, she saw the maroon car speed around the black car and watched as the maroon car sped up to her. Barnes accelerated and called 911.

When the maroon car passed Barnes's vehicle, Barnes caught part of the license plate—an H and a Z. Barnes testified that Will Rogers Boulevard did not have much traffic on it at that time, which was after midnight.

---

[1]The record reflected that Badger was five feet, four inches tall.

[2]The record reflected that Hicks was six feet, two or six feet, three inches tall.

### D. Hicks's Death

Officer Collin Sweeney with the Fort Worth Police Department (FWPD) testified that he was dispatched to a shooting in the 6900 block of Will Rogers Boulevard at 1:15 a.m. on April 19, 2017. When Officer Sweeney arrived on the scene two minutes later, he saw a black sedan that had crashed into a light pole. Officer Sweeney saw blood all over the windshield and dashboard and a black male slumped over the gear shift. Officer Sweeney felt what he thought was a hole or slivered skin on the driver's neck. Hicks was pronounced dead in the emergency room at John Peter Smith Hospital at 1:42 a.m.

Dr. Mark Krouse, the chief deputy medical examiner who performed the autopsy, testified that Hicks was a healthy thirty-two-year-old man. The cause of his death was blood loss from the carotid artery injury due to a gunshot wound to the neck. Dr. Krouse ruled Hicks's death a homicide.

### E. The Investigation

Officer Cassidy Tischler with the FWPD testified that when she arrived on the scene at 1:29 a.m., she obtained a description of the suspect's vehicle—a maroon four-door Mercury. Officer Tischler provided information about the vehicle to the FWPD's Real-Time Crime Center, which identified two vehicles in the southside area matching the vehicle's description. After running the partial license plate information, only one of the two vehicles matched both the vehicle description and the partial

license plate. Officer Tischler arrived at 2:00 a.m. at the address connected to that vehicle and saw a maroon vehicle parked in front of the home.

Detective Bruce Anderson with FWPD's Special Response Team was called around 2:00 or 3:00 a.m. to guard a car that had been involved in a homicide. He went to a cul-de-sac and surveilled the vehicle. While he and his team were watching the vehicle in the cul-de-sac, the patrol unit informed Detective Anderson that in the next cul-de-sac over, there was a black male who was wearing a white shirt and red shorts. Detective Anderson walked around the corner and saw that the male was standing in front of the house that was directly behind the house that was being surveilled. Detective Anderson described the individual as a medium-skinned black male who was five foot ten to six feet tall and who was around thirty to thirty-five years old. Detective Anderson instructed two members of his team to go talk to the male. As the two team members turned the corner, the man took off running and jumped a fence. The person was not caught. Detective Anderson testified that the man looked vaguely like a man in a family portrait that was in the entryway of the home where the vehicle was being surveilled.

Officer Christopher Bain with FWPD's crime scene search unit testified that he had arrived at 2:02 a.m. and had photographed the crash site (outside the Ball Corporation parking lot). Officer Bain also collected two shell casings and a live .9 millimeter bullet from the shooting scene (the corner of Joel East and Will Rogers).

He then went to Badger's home. Officer Bain testified that a red vehicle with license plate HRZ #### was parked at the home. Officer Bain took pictures of the vehicle showing red stains in the tire tread and "spatter" along the underside of the vehicle. Inside the home, Officer Bain collected three guns and almost 400 rounds of ammunition.[3]

Detective Ernest Pate with FWPD testified that he had arrived at the scene on Will Rogers Boulevard at 3:00 a.m. and had noted a black Ford vehicle that was resting against a lamp post. The driver of the vehicle had already been transferred from the scene via ambulance.

Around 4 a.m., Detective Pate went to the address associated with Badger's license plate and saw a red four-door Mercury with an H and a Z in the license plate. He noted that the vehicle appeared to have blood in the wheel well and requested that the vehicle be taken to the auto pound.[4] Detective Pate knocked on the door and received Badger's wife's consent to search the home. Badger was not in the home.

Detective Pate obtained surveillance video from the guard shack at the Ben E. Keith distribution center, but it was not of good quality, did not show the date and

---

[3]The guns collected from the home did not match the ballistics from the two casings and the live cartridge that were found at the shooting scene.

[4]Officer Timothy Lee with FWPD's Crime Scene Search Unit testified that he went to the crime scene bay at the auto pound two days after the incident. Officer Lee noted that the red Mercury's right front wheel and back wheel on the passenger side contained red stains. He took sample swabs of several places that contained red stains, and using black fingerprint powder, he created a tread pattern of the right side wheels.

time, and did not show the two vehicles involved. Detective Pate was told that there was video available showing the date and time, but he was unable to obtain that video after following up with the contact person several times. Detective Pate testified on cross-examination that he did not check with any of the owners of the surrounding buildings to see if they had surveillance cameras.

Detective Pate spoke with several managers and with twenty to thirty employees at the distribution center and received no information that Hicks and Badger had any prior incidents, arguments, or fights.

On cross-examination, the defense asked if Detective Pate had made any mistakes in this investigation, and he replied, "Sure." Detective Pate explained that there were three witnesses—Wisdom, Barnes, and Mitchell—and that his understanding was that all three witnesses had been interviewed when, in fact, only two were interviewed. Detective Pate did not discover until he was preparing for trial that Wisdom had not been interviewed. Detective Pate said that if he had the chance to redo this investigation, he would interview Wisdom. But Detective Pate stated that he "100 percent" stood behind the investigation that he had done in this case and that interviewing Wisdom would not have changed the outcome of the case. Detective Pate said that he would "take the forensic evidence over what anyone says any day because . . . people make mistakes."

Detective Pate testified that the steering wheel of the red Mercury was swabbed and that the swab was sent for DNA testing but was not tested for gunshot residue

8

(GSR). Detective Pate explained that DNA evidence is stronger than GSR because GSR can be picked up from an item other than a gun and because GSR is questioned by the Texas Forensic Commission whereas DNA is not.

Detective Pate acknowledged that his supervisor did not sign off on Badger's arrest warrant. On redirect, Detective Pate testified that the arrest warrant was signed by a judge.

### F. Badger's Arrest

After the arrest warrant was issued, FWPD Officer Michael Ruelas surveilled Badger's wife but rarely saw her at home in the evenings. Officer Ruelas believed that Badger's wife was meeting Badger somewhere. Officer Ruelas ultimately arrested Badger at a Motel 6 on South Freeway on April 25, 2017.

### G. Forensic Evidence

John Witkowski, a forensic scientist with the Texas Department of Public Safety's regional crime lab, testified that he had compared rolled tire impressions from the red Mercury to photographs of tire impressions that were left in blood stains on the roadway at the scene. After his analysis, Witkowski concluded that

> [t]he two partial overlapping tire impressions are similar in size and general tread design to the test impressions from the right rear tire of the suspect vehicle, and the second partial tire impression is similar to the right front tire of the suspect vehicle.
>
> It is my opinion that these partial tire impressions could have been made by these tires from the suspect vehicle or any other tire with a similar tread design.

9

Trisa Crutcher, a senior forensic scientist with the FWPD crime lab in the biology unit, testified that the partial DNA profile obtained from the swab of the red Mercury's steering wheel was consistent with originating from Badger and that the DNA profile obtained from the swab of the red Mercury's interior front right wheel well was identified as originating from Hicks.

## H. Trial Outcome

After hearing the above evidence, the jury found Badger guilty of murder as charged in the indictment.

## III. Sufficient Evidence Supports Badger's Murder Conviction

In his second point, Badger argues that the evidence is insufficient to show that he caused Hicks's death.

## A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the

10

evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. Moreover, the standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

### B. The Law on Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly

11

dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2).

## C. Analysis

Badger does not challenge that Hicks's death resulted from being shot with a firearm. Badger instead argues that the State did not prove beyond a reasonable doubt that he was the shooter. Badger focuses on the absence of (1) any eyewitness testimony that he had pointed a gun at Hicks, had pulled the trigger, and had killed him; (2) the murder weapon; and (3) any ammunition in his home that matched the bullets that had been used in the shooting. As set forth above, direct evidence is not required; a conviction may be supported by circumstantial evidence. *See Jenkins*, 493 S.W.3d at 599 ("Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient."). Thus, the absence of the evidence specified by Badger does not undermine his conviction.

Badger also argues that the eyewitness testimony that was provided was conflicting regarding the color of Badger's vehicle and the number of gunshots. But conflicting evidence regarding the number of gunshots and the color of Badger's vehicle does not render the evidence insufficient as we defer to the factfinder to resolve conflicts in testimony.[5] *See id.*

---

[5]Within the "Statement of Facts" in Badger's brief, he states that "[Detective] Pate made numerous mistakes investigating this case." Badger then goes on to state that Detective Pate failed to (1) interview Wisdom, (2) test the steering wheel in Badger's vehicle for GSR, (3) inquire whether buildings near the shooting scene had

Here, the evidence tending to prove that Badger was the shooter is as follows:

- Hicks told Valle when he came home for his lunch that he was upset with a coworker, and he returned to work against her request.

- Hicks and Badger worked at the same distribution center and left the parking lot at the distribution center at the same time.

- There was very little traffic on Will Rogers Boulevard at that time of night, and Barnes testified that she saw no other cars that night.

- Approximately five minutes after Badger and Hicks left the distribution center's parking lot, Barnes saw two black men arguing beside their vehicles, which were stopped on the roadway not far from the distribution center. Barnes described the black man who was next to the maroon Mercury or Taurus as short, and the record revealed that Badger was five feet, four inches tall. Barnes described the black man who was near the black car as tall, and the record revealed that Hicks was six feet, two inches tall or six feet, three inches tall.

---

surveillance cameras, and (4) obtain his supervisor's signature on the arrest warrant pursuant to department policy. Badger does not raise these arguments in his sufficiency argument. Even if his sufficiency argument can be broadly construed as fairly including his challenges to the investigation conducted by Detective Pate, "[o]ur review concerns the sufficiency of the evidence presented at trial, . . . rather than the sufficiency of the police investigation, and we do not speculate about evidence [that] the State did not present." *See Delbrey v. State*, Nos. 05-18-00790-CR, 05-18-00791-CR, 2019 WL 3773851, at *4 (Tex. App.—Dallas Aug. 12, 2019, no pet.) (mem. op., not designated for publication).

13

- Moments after Barnes drove past the two vehicles, she heard a gunshot and saw the red vehicle speed around the black vehicle. After the red vehicle caught up to her and passed her, she saw that the license plate contained an H and a Z.

- Barnes's partial plate identification, combined with the vehicle log from the distribution center and information obtained from the Real-Time Crime Center, helped officers match the plate to Badger's red Mercury, which was found at his home.

- Badger's vehicle's interior front right wheel rim contained blood that was identified through DNA testing as originating from Hicks.

- Comparisons of the partial tire impressions that were left in the blood on the roadway to the known impressions made by the tires on Badger's vehicle did not rule out Badger's vehicle as one that could have left the partial tire impressions on the roadway at the scene.

- Less than two hours after the shooting, officers spotted a man who resembled Badger in the area near his home, but the man ran when he saw police. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight.").

- Although Badger's wife and his home remained under surveillance after that night, he was not seen at his home. Badger was ultimately apprehended at a Motel 6 six days after the incident.

While each circumstance of guilt considered in isolation is insufficient to prove that Badger was the shooter, when all of the evidence is viewed in the light most favorable to the verdict and when the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom are considered, we conclude that the evidence is sufficient to show that Badger was the shooter. *See Ingerson v. State*, 559 S.W.3d 501, 511 (Tex. Crim. App. 2018) (holding circumstantial evidence sufficient to identify appellant as the shooter); *Clayton*, 235 S.W.3d at 779–82 (holding that a rational juror could find beyond a reasonable doubt that appellant was responsible for killing victim based on reasonable inferences from and cumulative force of the incriminating circumstantial evidence presented). Accordingly, we hold that the evidence is sufficient to support Badger's conviction for murder. *See Clayton*, 235 S.W.3d at 782. We overrule Badger's second point.

## IV. The Trial Court Did Not Abuse Its Discretion by Denying a Mistrial

In his first point, Badger argues that the trial court abused its discretion by denying his request for a mistrial when a juror allegedly failed to disclose a close relationship with "a high-ranking employee of the Tarrant County Criminal District Attorney's office."

15

## A. Standard of Review

A trial court's denial of a motion for mistrial is reviewed under an abuse-of-discretion standard. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). Under this standard, we will not disturb the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* Likewise, we review a trial court's determination concerning juror bias for an abuse of discretion. *Granados v. State*, 85 S.W.3d 217, 236 (Tex. Crim. App. 2002).

## B. Applicable Law

This court has previously set forth the law regarding the right to an impartial jury:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI; *see also* Tex. Const. art. 1[,] § 10 ([stating that] "[i]n all criminal prosecutions the accused shall have a speedy public trial by an impartial jury"); *Franklin v. State*, 138 S.W.3d 351, 354 (*Franklin II*) (Tex. Crim. App. 2004). Included in the constitutional right to an impartial jury is the ability to conduct adequate voir dire to identify unqualified jurors. *Franklin II*, 138 S.W.3d at 354. The Texas Court of Criminal Appeals has "consistently held that essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury 'is the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause.'" *Id.* (quoting *Raby v. State*, 970 S.W.2d 1, 10 (Tex. Crim. App. 1998)).

> When a juror "'withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury.'" *Franklin II*, 138 S.W.3d at 354 (quoting *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)). Thus, the defendant "must show that the juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by

the defendant." *Franklin II*, 138 S.W.3d at 355–56. In order to show materiality, the concealed information does not have to show actual bias, just that it has a tendency to show bias. *Id.* at 356. "[M]ere familiarity with a witness is not necessarily material information." *Franklin v. State*, 12 S.W.3d 473, 478 (*Franklin I*) (Tex. Crim. App. 2000); *see Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1983). In the event that a juror withholds material information during voir dire, it is not dispositive of the issue if the juror states that it will not affect his verdict. *Franklin II*, 138 S.W.3d at 355–56. The good faith of the juror is "largely irrelevant when considering the materiality of information withheld." *Franklin I*, 12 S.W.3d at 478.

The burden is initially on the parties to be diligent during voir dire and ask all pertinent questions to reveal potential bias. *Gonzales v. State*, 3 S.W.3d 915, 917–18 (Tex. Crim. App. 1999).

*Nelson v. State*, Nos. 02-07-00299-CR, 02-07-00300-CR, 2009 WL 885914, at *3–4 (Tex. App.—Fort Worth Apr. 2, 2009, no pet.) (mem. op., not designated for publication).

With regard to counsel's duty to be diligent in eliciting pertinent information from prospective jurors during voir dire in an effort to uncover potential prejudice or juror bias, the Texas Court of Criminal Appeals explained in *Gonzales* that

defense counsel has an obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial, truthful, and the like. Unless defense counsel asks such questions, we must hold, as we do here, that the purportedly material information which a juror fails to disclose is not really "withheld" so as to constitute misconduct which would warrant a reversal.

Counsel must ask *specific* questions, not rely on broad ones, to satisfy this obligation. And counsel must ask follow-up questions after uncovering potential bias. We have consistently held there is no error where counsel has not met that obligation.

3 S.W.3d at 917 (citations omitted). The *Gonzales* opinion went on to explain that

counsel's burden is not lessened when juror questionnaires are utilized:

> We see no reason why counsel's burden to use diligence should be any less in the case of written juror questionnaires. *Particularly* because of the nature of *written* questions, counsel should be sure to ask follow-up oral questions concerning any information on the form that counsel deems material. While a questionnaire may serve as an efficient vehicle for collecting demographic data, it is not the most reliable way to collect other types of information. Counsel should never assume that the respondents will understand each question as it was intended by counsel to be understood. As this case illustrates, written questions are by nature vulnerable to misinterpretation—even questions that appear to be subject to only one interpretation. For this reason, "diligent counsel" will not rely on written questionnaires to supply any information that counsel deems material. Counsel who does otherwise is simply not diligent.

*Id.*

### C. What the Record Shows

After the jury was picked but before the presentation of evidence, the trial

court took up pending motions. The State then put the following on the record:

> There was one issue that came up late yesterday. We haven't had a chance to tell defense about it, but we wanted to just put it on the record.
>
> We found out yesterday well after 5:00 that one of the jurors is related to the public relations spokesperson for the district attorney's office. Ms. Jordan is the mother of Samantha Jordan, the district attorney's public relations person. We found this out from Samantha Jordan.
>
> As far as we know, there ha[ve] been no discussions between Ms. Jordan and her mother. There ha[ve]n't been any discussions between Juror Ms. Jordan and the State; although, we did run into her in the

18

hallway, and that's when it was discovered. We wanted to let the court know that as soon as possible.

For the record, during voir dire, neither side asked the panel at large if they knew anyone in the district attorney's office specifically. I think the question is asked on the jury questionnaire generally of all of the panel if they know anyone in a law office or if they themselves are a lawyer.

And several jury members, some of which are on the panel, some of which aren't, noted that they knew people in law enforcement. Samantha Jordan, who is employed by the district attorney's office, is not an attorney. She is -- I believe her background is in marketing, and she handles media and public relations for the district attorney, Sharen Wilson.

[DEFENSE COUNSEL]: Judge, certainly, if I had known that a juror's daughter worked for the Tarrant County District Attorney's Office, I would have either sought to strike her for cause or certainly a peremptory challenge.

And she also had plenty of opportunity to say it, and she had plenty of opportunity to put it on her questionnaire. I think the questionnaire is manifestly -- fairly would elicit that answer, so I have to object to the mother of a Tarrant County DA employee sitting on a jury in this murder case.

[THE PROSECUTOR]: If I may, Your Honor, just to clarify a little bit of the record, I don't have the copies of my questionnaires anymore. . . . They're under seal . . . .

I don't recall what her answer was to any of the particular questions that dealt with if she knew someone in a law office. I don't know that it's entirely fair to say that she had the opportunity to volunteer it because neither side really asked her if she knew anyone.

In many courts here in Tarrant County, other judges ask, before they hand voir dire over to the State, for anyone to have the opportunity to say if they know the ADAs who have been introduced, the defense attorneys who have been introduced, the Judge, the bailiffs. That wasn't

19

asked of the panel. Maybe I should incorporate that into my general voir dire, but I didn't ask either and neither did the defense.

She did note other people that she was related to. In fact, the State knew that she was the wife of a city councilman. We didn't know that our colleague was the daughter of a city councilman, and we didn't know that our colleague had someone serving jury duty because that hadn't been discussed.

I don't think that the record would show that anything inappropriate happened. I mean, certainly, if something needs to be put on the record in respect to that juror, if she's here, that's understandable. But I don't think, as of now, anything has risen to the level of it being inappropriate.

Badger's counsel "disagree[d] completely." He moved for a mistrial and stated, "I think we have to pick a new jury and then go forward." But Badger did not ask to question Jordan. The trial court ultimately denied the motion. After the trial court ruled, Badger put on the record the two questions from the juror questionnaire that were relevant to the issue at hand:

I'm looking at the questionnaire for Juror Glenda Jordan. And, really, there are two questions that are at issue here. And I think, for appellate purposes, if one of these questions doesn't apply, surely the other one would.

And that is question number 18, "Have you or someone close to you ever worked as a police officer or in law enforcement? If yes, please describe." Her answer, "No."

Number 19, "Have you or someone close to you ever worked for a law firm or private attorney? If yes, please describe." The witness's answer, "No."

20

## D. Analysis

Badger's argument on appeal is premised on his belief that the questions on the questionnaire constituted due diligence on defense counsel's part in asking questions that would have revealed Jordan's alleged bias. Badger's argument presupposes that an average juror who does not practice law would interpret the term "law enforcement" in question 18 and the terms "a law firm or private attorney" in question 19 as including someone who works for the Tarrant County DA's Office.[6] But counsel cannot assume that potential jurors "will understand each question as it was intended by counsel to be understood." *See id.*

Here, neither question 18 nor question 19 on the juror questionnaire specifically asked whether the respondent knew or was related to an employee of the Tarrant County DA's Office. And defense counsel did not ask any oral questions during voir dire concerning the venire members' connections to employees of the Tarrant County DA's Office. Because defense counsel did not follow up on the written questionnaires with more specific questioning during voir dire, Jordan did not withhold material information. *See id.* at 918; *Armstrong v. State*, 897 S.W.2d 361, 363–64 (Tex. Crim. App. 1995) (concluding that no material information was "withheld"

---

[6]Badger relies heavily on *Franklin I*, which held that the information withheld from appellant by the juror was material. 12 S.W.3d at 476–79. In that case, the jurors were specifically asked if they knew the witness C.N.T., and no one in the venire mentioned that they knew her. *Id.* at 475. After C.N.T. took the witness stand, a juror passed a note to the judge stating that she knew C.N.T. *Id.* at 476. *Franklin I* is therefore distinguishable on its facts because the juror gave an incorrect answer to a specific question about her knowledge of witness C.N.T.

because no one ever asked the panelists if they knew or were acquainted with the prosecutors); *Chavez v. State*, No. 05-17-00795-CR, 2018 WL 2773259, at *2 (Tex. App.—Dallas June 11, 2018, no pet.) (mem. op., not designated for publication) ("[N]o juror withheld information because neither party asked the venire whether they knew appellant."). Moreover, because we conclude that no material information was withheld, we further conclude that Badger has not shown that he was deprived of an impartial jury or denied a fair trial as a result of any trial court error. Accordingly, we hold that the trial court did not abuse its discretion by denying Badger's motion for mistrial, and we overrule Badger's first point.

## V. Modification to Judgment

As noted in a footnote in Badger's brief, the judgment incorrectly reflects that the jury, not the trial court, assessed punishment. An appellate court has the authority to modify a judgment to make it speak the truth when it has the necessary information to do so. *See Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Exercising our authority to make the judgment speak the truth because we have the necessary information, we modify the judgment in two places to reflect that the trial court, not the jury, assessed punishment. *See id.*; *see also Tenorio v. State*, No. 07-16-00278-CR, 2017 WL 1373813, at *1 (Tex. App.—Amarillo Apr. 13, 2017, no pet.) (mem. op., not designated for publication) (modifying judgment to reflect that the trial court, not the jury, assessed punishment).

22

## VI.  Conclusion

Having overruled both of Badger's points and having modified the judgment to reflect that the trial court assessed punishment, we affirm as modified the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 10, 2019

23